Damien Wayne ECHOLS *v*. STATE of Arkansas

CR 99-1060 127 S.W.3d 486

Supreme Court of Arkansas

Opinion delivered October 30, 2003

[Petition for rehearing denied December 11, 2003.]

532

534

*Mandell & Wright, L.L.P.* (Houston), by: *Edward A. Mallett*; and *Alvin Schay* (Little Rock), for appellant.

*Mike Beebe*, Att'y Gen., by: *David R. Raupp*, Senior Ass't Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant Damien Wayne Echols appeals the trial court's denial of his petition for postconviction relief pursuant to Ark. R. Crim. P. 37. His prior appeal of this matter was reversed and remanded for the trial court to enter a written order in compliance with Ark. R. Crim. P. 37.5(i). *See Echols v. State*, 344 Ark. 513, 42 S.W.3d 467 (2001) (*Echols II*). The trial court has completed its written order, and the matter is now before us for a decision on the merits. We find no error and affirm.

### Facts and Procedural History

The gruesome, disturbing facts of these crimes were set out in great detail in this court's opinion in *Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996) (*Echols I*), and we see no reason to

repeat them here. Suffice it to say that Echols was charged, along with Jason Baldwin and Jessie Misskelley, with the murders of three eight-year-old boys, Michael Moore, Steve Branch, and Christopher Byers, which occurred on May 5, 1993, in West Memphis. The boys' bodies were found submerged in water in a drainage ditch near their homes. The bodies were naked and they had their right hands tied to their right feet and their left hands tied to their left feet. The evidence showed that two of the boys, Moore and Branch, had multiple knife wounds, but ultimately died from drowning. The third boy, Byers, had been mutilated, such that the skin of his penis had been removed, and the scrotal sac and testes were missing. The evidence demonstrated that Byers had bled to death. The evidence further demonstrated that all three boys had been sexually abused.

Misskelley was the first of the three codefendants to be tried, and he was convicted of one count of first-degree murder and two counts of second-degree murder, for which he was sentenced to life imprisonment and a total of forty years' imprisonment, respectively. This court affirmed his convictions and sentences in *Misskelley v. State*, 323 Ark. 449, 915 S.W.2d 702, *cert. denied*, 519 U.S. 898 (1996). Echols and Baldwin were subsequently tried together and were each convicted of three counts of capital murder. Baldwin received life imprisonment without parole, while Echols was sentenced to death. This court affirmed their convictions and sentences in *Echols I*. Echols then filed a petition for writ of certiorari in the United States Supreme Court, but that petition was denied. *See Echols v. Arkansas*, 520 U.S. 1244 (1997).

Echols subsequently filed a petition for postconviction relief pursuant to Rule 37. The trial court denied the petition, and Echols appealed. This court, in *Echols II*, remanded the matter to the trial court for entry of a written order in compliance with Rule 37.5(i).[1] Thereafter, the State filed a petition for rehearing, which this court denied. *See Echols v. State*, 344 Ark. 513, 522-A, 42 S.W.3d 467, 473 (2001) (*per curiam*). The trial court completed its written order on August 2, 2001, and the appeal was again scheduled before this court. Subsequently, Echols filed a motion to stay the appeal proceedings, so that he could pursue forensic DNA testing in the trial court, pursuant to Ark. Code Ann. § 16-112-

---

[1] Also in *Echols II*, this court affirmed the trial judge's refusal to recuse from the Rule 37 proceedings. Echols had argued for recusal because the judge had presided over his trial.

201 (Supp. 2001). This court granted the motion in *Echols v. State*, 350 Ark. 42, 84 S.W.3d 424 (2002) (*per curiam*). The stay was extended several times by this court, with a final extension being issued on June 19, 2003. *See Echols v. State*, 353 Ark. 755, 120 S.W.3d 78 (2003) (*per curiam*).[2] The appeal from the postconviction ruling is now before us for resolution on the merits.

## I. Trial Court's Findings

██ Echols first argues that the trial court erred on remand by adopting verbatim the proposed findings of fact and conclusions of law submitted by the State. He contends that this deprived him of due process. In support of this claim, Echols offers the proposed findings and conclusions submitted below. He also contends that the trial court's order does not comply with this court's directive in *Echols II*. He thus asks us to remand this matter a second time for the trial court to make further findings. We decline this invitation.

Echols has failed to demonstrate that the trial court's order is insufficient under the requirements of Rule 37.5(i). Rather, his chief complaint seems to be that the trial court did not break down its findings and conclusions into the 200 specific proposals offered by Echols on remand. Our directive in *Echols II*, however, required only that the trial court make specific written findings of fact and conclusions of law with respect to the issues that Echols chose to pursue on appeal:

> In sum, because Echols has been sentenced to death, we remand this case to the trial court for entry of a written order in compliance with Rule 37.5(i) and this court's holding in *Wooten*. We limit, however, the trial court's duties on remand to making factual findings and legal conclusions only as to the issues raised by Echols on appeal, as all other claims raised below but not argued on appeal are considered abandoned. Thus, this remand should not be construed by Echols as an opportunity to reopen the evidence or to raise new issues. Additionally, to avoid any lengthy delay in this matter, the order is to be completed within sixty days from the date the mandate is issued. We will then consider the issues raised on appeal.

---

[2] The parties have yet to complete the DNA testing, as of the date that this appeal was heard.

344 Ark. at 519, 42 S.W.3d at 470-71 (citations omitted). From our review of the order now before us, we are confident that the trial court fulfilled our instructions. We thus reject Echols's argument that the order does not comply with Rule 37.5(i).

We likewise reject his argument that his due process rights were violated due to the lack of opportunity to object to the trial court's findings and conclusions. Indeed, this court previously rejected this argument on October 11, 2001.[3] Though there were no reasons given for our denial at the time, we now hold that our directive in *Echols II* did not provide for any further hearing or other "due process." In fact, the trial court could have completed this task on its own, without any input from the parties. That the trial court allowed the parties to submit proposed findings does not change the limited nature of the directive for remand. Accordingly, Echols is entitled to no relief on this point.

## II. Trial Counsel's Conflicts of Interest

Echols's next three points involve allegations that his trial counsel, Val Price[4], was burdened by conflicts of interest, such that his representation of Echols was adversely affected. Generally, a defendant alleging a Sixth Amendment violation must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mickens v. Taylor*, 535 U.S. 162, 166 (2002) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). An exception to the rule that the defendant must show probable effect upon the outcome is where the assistance of counsel has been denied entirely or during a critical stage of the proceeding. *Id.* But only in "circumstances of that magnitude" is the defendant relieved of the burden to show that counsel's inadequate performance undermined the reliability of the verdict. *Id.* at 166 (quoting *United States v. Cronic*, 466 U.S. 648, 659, n.26 (1984)). " '[C]ircumstances of that magnitude' may also arise when the defendant's attorney actively represented conflicting interests." *Id.* at 166.

---

[3] In that same motion, Echols alternatively sought permission to expand the record on appeal to include the proposed findings and conclusions submitted by the parties below. This alternative motion was also denied.

[4] The trial record reflects that Echols was represented by two attorneys, Price and Scott Davidson. However, his arguments on appeal only implicate Price.

In *Mickens*, the defendant had been convicted of capital murder and sentenced to death. He sought a writ of habeas corpus on the ground that his Sixth Amendment right to the assistance of counsel had been violated, because one of his trial attorneys had previously represented the murder victim and the trial court failed to inquire into the potential conflict. He contended that this failure to inquire required an automatic reversal of his conviction, under the holdings in *Holloway v. Arkansas*, 435 U.S. 475 (1978), and *Wood v. Georgia*, 450 U.S. 261 (1981). The Court disagreed, holding that automatic reversal is only required where defense counsel is forced to represent codefendants over counsel's timely objection, unless the trial court has determined that there is no conflict.

The Court explained that absent an objection at trial, a defendant must demonstrate "an actual conflict of interest," which the Court defined as "a conflict *that affected counsel's performance* — as opposed to a mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171. *See also Townsend v. State*, 350 Ark. 129, 85 S.W.3d 526 (2002). The Court explained that "a defendant who shows that a conflict of interest *actually affected the adequacy of his representation* need not demonstrate prejudice in order to obtain relief." *Mickens*, 535 U.S. at 171 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980)).

Based on the foregoing principles, the *Mickens* Court denied the defendant's habeas claim, holding:

> Since this was not a case in which (as in *Holloway*) counsel protested his inability simultaneously to represent multiple defendants; and since the trial court's failure to make the *Sullivan*-mandated inquiry does not reduce the petitioner's burden of proof; it was at least necessary, to void the conviction, for petitioner to establish that the conflict of interest adversely affected his counsel's performance.

*Id.* at 173-74. Following this holding, the Court expressly noted that the only issue before it was the effect of the trial court's failure to inquire upon the *Sullivan* rule that deficient performance of counsel must be shown. Thus, the Court voiced no opinion as to whether, in cases where the alleged conflict of interests does not involve representation of codefendants, the applicable test is the *Sullivan* adverse-effect test or the *Strickland* prejudice test.

In *Townsend*, 350 Ark. 129, 85 S.W.3d 526, this court interpreted *Mickens* as holding that until it is shown that counsel actively represented conflicting interests, a defendant has not established the constitutional predicate for a claim of ineffective assistance of counsel. This court held:

> Thus, in the absence of an "actual conflict," a defendant alleging counsel's performance was deficient due to a conflict must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [*Mickens*, 535 U.S. 162, 166 (quoting *Strickland*, 466 U.S. 668, 694)]. In other words, an analysis of a conflict of interest under *Mickens* requires the same kind of analysis — and the same kind of *demonstration* of prejudice — that is required under *Strickland v. Washington*, 466 U.S. 668 (1984), as opposed to the *presumption* of prejudice (and the consequent automatic reversal) that was explained in *Holloway*.

*Id.* at 135, 85 S.W.3d at 528-29. This court then noted that the Court's holding in *Mickens* was consistent with this court's own holdings:

> [W]e additionally note that this *Strickland*-type determination of the existence of prejudice, required by *Mickens*, is in keeping with our own holdings. In *Wilburn v. State*, 346 Ark. 137, 56 S.W.3d 365 (2001), an attorney-disqualification case, we held that this court reviews a trial court's decision to disqualify an attorney under an abuse-of-discretion standard. There, this court first noted Supreme Court cases holding that where a constitutional right to counsel exists, there is a correlative right to representation that is free from conflicts of interest. In addition, the *Wilburn* court stated the following:
>
> > The cornerstone principle in all conflict cases is whether prejudice will result to the client as a result of the conflict of interest. *See Sheridan v. State*, 331 Ark. 1, 959 S.W.2d 29 (1998). That prejudice must be real and have some demonstrable detrimental effect on the client and not merely be abstract or theoretical. *See Simmons v. Lockhart*, 915 F.2d 372 (8th Cir. 1990); *Sheridan v. State, supra.*
>
> *Wilburn*, 346 Ark. at 143.

> Prejudice will be presumed from a counsel's conflict of interest only when the defendant demonstrates that counsel actively represented conflicting interests. *Price v. State*, 347 Ark. 708, 66 S.W.3d 653 (2002) (citing *Cuyler v. Sullivan, supra; Johnson v. State*, 321 Ark. 117, 900 S.W.2d 940 (1995)). *See also Davis v. State*, 345 Ark. 161, 44 S.W.3d 726 (2001) (holding that prejudice is presumed from a conflict of interest *only when the defendant demonstrates that an actual conflict of interest adversely affected his lawyer's performance*). In the absence of a showing of prejudice, we will find no abuse of discretion in the trial court's decision to deny counsel's motion to withdraw.

*Townsend*, 350 Ark. at 135-36, 85 S.W.3d at 529.

As will be more fully demonstrated below, none of the alleged conflicts of interest offered by Echols involves trial counsel's representation of multiple codefendants. Thus, we apply the standard enunciated in *Townsend* and review these claims first to determine whether Echols has shown the constitutional predicate that counsel actively represented conflicting interests. If that showing is made, the remaining inquiry is whether the conflict adversely affected counsel's representation of Echols, under *Sullivan*. If it is not shown that counsel actively represented conflicting interests, the remaining inquiry is whether prejudice has been shown under *Strickland*. With these legal principles in mind, we review Echols's allegations of counsel's conflicting interests.

### A. The HBO Contract

Echols first argues that Price labored under an actual conflict of interests as a result of a contract to film the trial that was entered into between Echols and Home Box Office (HBO).[5] To better understand this claim, some background information is helpful. Approximately one month after the crimes were committed and after Echols and his codefendants had been arrested, filmmakers Bruce Sinofsky and Joe Berlinger approached the defendants about making a documentary about the crimes and their trials. Sinofsky and Berlinger had a contract with HBO to produce the documentary, which would be shown on the cable television network. All three defendants agreed to allow Sinofsky and Berlinger to inter-

---

[5] All references in this opinion to HBO include the production company, Creative Thinking International, Ltd., which was under contract with HBO to produce and film the documentary about these crimes.

view them for the film. In exchange, the defendants were each to be paid $7,500 for their interviews. Additionally, the parties agreed to allow the filmmakers to place cameras in the courtroom and film the trial of Echols and Baldwin. The film, *Paradise Lost: The Child Murders at Robin Hood Hills*, was not shown until after the trial.

The trial court found that no actual conflict existed, because the contract was between the filmmakers and Echols, who was eighteen years old at the time, and because Echols and his family supported the filmmaking project. The trial court found further that both the contract and the film itself were beneficial to the defense. The court found that the contract benefitted the defense in two ways: (1) it provided a source of funds for the defense without the exposure of defense strategy to the prosecution; and (2) it provided trial counsel with tapes of the proceedings that could be viewed daily to assess the progress of the trial. The trial court found that the film benefitted Echols, in that funds have been and continue to be raised for his defense and that he now has the services of "pro-bono attorneys of national recognition and mass publicity[.]"

Echols argues that the trial court's ruling is erroneous. He claims that even though the contract was between himself and HBO, Price was still conflicted because he advised Echols to enter into the contract and because the "demands" of the contract were at odds with Echols's interests. To support this claim, Echols argues that Price had a personal long-range pecuniary interest in the film's success. He alleges that Price was burdened by a desire to improve his legal business, which would apparently result from the personal notoriety that Price would gain from appearing in the film.

He claims further that the conflict adversely affected his defense in three ways. First, he asserts that Price sacrificed time he could have spent preparing for the trial on the film, by "staging" a strategy meeting between himself, co-counsel, and the defense investigator. Second, he contends that Price relied on funds to be paid from the HBO contract, for such things as pretrial investigation, discovery, and expert witnesses, and thus did not seek available, and perhaps more abundant, funds from the trial court. Finally, he asserts that his defense was directly and adversely affected by Price's decision not to seek a continuance to allow publicity to die down from Misskelley's trial, which had taken place two weeks earlier in nearby Clay County. On this last point,

Echols claims that Price did not want a continuance because he wanted to get the trial finished before the scheduled date for the film's release. The conclusion that Echols draws from this is that counsel was obviously placing the interests of the film and its makers over that of his client. The record does not support his contentions.

During the Rule 37 hearings, Price testified he advised Echols to enter into the contract, and that Echols was very receptive to the idea. He stated that the contract benefitted Echols because it provided funds for his defense without exposing defense strategy to the prosecution. He explained that he and co-counsel, Scott Davidson, "thought long and hard about the issue of do we need experts, what should we do about the money, is it possible to file anything under seal, or is there another source to get money from." They ultimately decided that they could use the money from the film contract to explore the idea of consulting experts without having to request funds from the trial court, and thereby potentially revealing their strategy to the prosecution. Moreover, Price testified that in addition to the funds, the relationship with HBO provided the defense with video tapes of the proceedings as they were unfolding, allowing the defense to view the tapes daily and assess the progress of the trial. When asked whether he had received any money from the contract, Price testified that he had been paid approximately $1,900 from the contract funds, but that the money was to reimburse him for expenses that he had paid out during the course of the trial and on appeal.

As for the decision not to seek a continuance, Price testified that although there was a great deal of publicity stemming from Misskelley's trial, he felt that a continuance would not be in his client's best interest because he believed that the media interest would not have waned at all by continuing the case for a month or two. He stated further that there was a good chance that the opposite would occur, that the publicity would have increased. He also stated that although he could not recall whether he had consulted with Echols on this particular decision, he believed that he had consulted with his client about every major decision in the case. Price also voiced concern about delaying the trial beyond the scheduled release date for the film, not for benefit of the filmmakers or HBO, as Echols asserts, but because the release of the film may have influenced potential jurors against Echols.

As for the "staged" strategy meeting, Price explained that he had agreed to recreate for the cameras a meeting between himself, co-counsel, and the defense investigator regarding the decision whether to call a certain witness. Price stated that he was not paid for his participation in this part of the film and that was the only part of the film that was recreated.

Echols's attorney questioned Price about the entertainment value that such a "staged" meeting would add to the film, in an attempt to show that Price was interested in the movie's success so that he and his legal practice would benefit from the film's exposure. Apparently, it was Echols's theory that the more entertaining the film was, the more likely that it would find a large audience, and that Price would benefit financially from the exposure. During oral argument before this court, Echols's counsel claimed that the time Price spent in this "staged" meeting could have been spent more productively on preparing for trial. The problem with these allegations is that they are just that — allegations, with no factual support. Echols failed to offer any evidence to the effect that the minimal time that Price spent recreating the strategy meeting, which apparently lasted only minutes, adversely affected the defense, *i.e.*, because he forfeited an opportunity to interview a key witness or failed to attend a hearing before the trial court. The bottom line is that Echols cannot show any adverse effect that resulted from his agreement to allow HBO to film the trial and conduct interviews with himself and his trial counsel.

Based on the foregoing, we conclude, as did the trial court, that Echols failed to show an actual conflict of interests, *i.e.*, that counsel actively represented conflicting interests, involving the contract with HBO to make the documentary film. We further conclude that Echols has failed to show that he was in any way prejudiced by counsel's performance, as required under *Strickland*, 466 U.S. 668. We agree with the trial court that the record shows that counsel acted in Echols's interest, and that his defense was aided, not impeded, by the film contract. We thus reject this claim for relief.

### B. Representation of a Codefendant to Byers

Echols next argues that Price had a conflict of interests because of his representation in a civil matter of a codefendant of John Mark Byers, the stepfather of one of the murder victims.

During the Rule 37 hearing, Price testified that Byers and his wife were sued along with Price's clients for taking property from a jewelry store in which Price's clients were part owners. At some point in the proceedings, Byers and his wife were dismissed from the suit. Thereafter, at a bench trial, Byers testified on behalf of Price's clients. The civil trial was completed prior to Echols's trial, and the parties were merely awaiting a decision from the circuit court.

Echols contends that this situation created a conflict of interests because Byers's testimony was necessary to Price's civil client's case. Echols argues that this conflict adversely affected his defense in that Price did not aggressively question Byers about his possible involvement in the murders.

The evidence does not support Echols's allegation on this point. Indeed, we are hard pressed to see any actual conflict arising from Price's connection to Byers in the civil matter. Moreover, we cannot see how any alleged conflict prejudiced his defense. The trial record reveals that the issue of Byers's possible involvement in the murders was put before the jury. See *Echols I*, 326 Ark. 917, 936 S.W.2d 509. Byers was called as a defense witness for the purpose of exposing prior inconsistent statements that he had made to police regarding the appearance of blood, which matched his and his son's blood-type, on a knife that he owned. Perhaps more significantly, Price cross-examined Officer Gary Gitchell about his interview with Byers and about the fact that the officer had read Byers his *Miranda* rights prior to interviewing him. Gitchell explained that he had considered Byers to be a possible suspect in the homicides. Echols has failed to demonstrate prejudice on this point.

### C. Prior Representation of Michael Carson

Echols next contends that a conflict of interests existed as a result of Price's prior representation of Michael Carson on a juvenile matter. Carson was called as a witness for the prosecution against Echols's codefendant, Jason Baldwin. Carson testified that Baldwin had made a jailhouse confession about the murders. Carson testified as follows:

> I said, just between me and you, did you do it. I won't say a word. He said yes and he went into detail about it. It was just me and Jason [Baldwin]. He told me he dismembered the kids, or I don't know

exactly how many kids. He just said he dismembered them. He sucked the blood from the penis and scrotum and put the balls in his mouth.

*Echols I*, 326 Ark. 917, 941, 936 S.W.2d 509, 519-20. The record reflects that Echols's counsel did not cross-examine Carson, but Baldwin's counsel did so rigorously.

 The trial court found that Echols could have no complaint about Carson's testimony because it was not admissible against him, only his codefendant, Baldwin. The trial court also found significant Price's testimony that if he had cross-examined Carson, he may have inadvertently suggested to the jury a connection between Echols and Carson's testimony. Finally, the trial court noted that although Echols had the services of two court-appointed attorneys, he made no effort at all to discredit co-counsel, Scott Davidson, concerning his representation of Echols. These findings are supported by the record.

During the Rule 37 proceedings, Price testified that the trial judge was aware of his former representation of Carson. Because of that situation, the defense team had agreed that Davidson would be the one to conduct any cross-examination of Carson. Subsequently, however, Price and Davidson decided not to cross-examine Carson for several reasons. First, Price stated that he had no impeaching evidence to add to Baldwin's counsel's cross-examination, as he had already supplied Baldwin's counsel with any potential impeachment material on Carson. Second, he relied on the trial court's ruling that, although Echols and Baldwin were tried as accomplices, Carson's testimony would only be admitted against Baldwin. Indeed, the trial court instructed the jury that Carson's testimony was only admissible against Baldwin. Lastly, Price felt that if he had cross-examined Carson, he would be running the risk of opening the door to a line of questioning that may influence the trial judge to change his mind about the applicability of Carson's testimony to Echols.

Echols has failed to demonstrate that counsel actively represented conflicting interests. He has further failed to demonstrate that his defense was in any way prejudiced by the alleged conflict. We thus affirm on this point.

### III. *Financial Arrangements Between a Witness and Documentary Filmmakers*

Echols next argues that the trial court erred in refusing to permit him to inquire into the financial arrangements between John Mark Byers and HBO. This claim is tied to the preceding claims. Specifically, Echols contends that Byers had received money from HBO and that, accordingly, he had a financial stake in the outcome of the trial and was therefore a biased witness. The record does not support this contention.

During the Rule 37 proceedings, counsel for the filmmakers and HBO repeatedly objected to Echols's attempts to determine the terms of the contract between Byers and his wife and HBO. Nonetheless, one of the filmmakers, Bruce Sinofsky, testified that the money paid to the victims' families was more of a humanitarian act, and was not payment for interviews. Sinofsky testified unequivocally that the victims' families were "not obliged by contract to participate in any filming at any given time. We did not buy their interviews." The record reflects further that Echols's postconviction attorney, Mr. Mallett, asked the trial court to "examine these contracts in camera to make a determination as to whether there is any language in the contracts relating to the giving of interviews[.]" The trial court agreed to review the contracts and, afterwards, made the following finding:

> The language contained in it basically says, I'm a willing participant in the documentary and they received the consideration — or as it's called, an honorarium — to give up the rights to have their likeness and voice portrayed. There's nothing in it about any interview or certainly nothing about any testimony. It's just simply a waiver of any claim for having their likeness and voice exhibited.

Thereafter, upon Echols's motion and without objection, the circuit court agreed to make the contracts part of a sealed record for appellate review.

Echols now contends that the trial court erred in refusing to allow him to inquire into the financial arrangements between HBO and Byers to the extent that he wished. He claims that this limitation prevented him from developing his claim that trial counsel was burdened by a conflict of interests between his

representation of Echols and his desire not to expose Byers as an incredible witness. He asks us to remand for development of a full and fair record on this issue.

The State contends, on the other hand, that this argument is procedurally barred because Echols failed to abstract the contracts. The State asserts that even though the contracts have been sealed, Echols could have sought permission from this court to abstract the documents under seal. *See Johnson v. State*, 335 Ark. 333, 982 S.W.2d 669 (1998) (*per curiam*). Alternatively, the State argues that Echols's argument is barred because he received all the relief he requested, in that the trial court reviewed the contracts *in camera* and determined that there was no support for his claim that Byers was biased. *See Marshall v. State*, 342 Ark. 172, 27 S.W.3d 392 (2000) (holding that it is a basic principle of law that where the appellant received the only relief he requested, he has no basis upon which to raise the issue on appeal).

 Echols offers no convincing argument or authority in support of his argument on this point. We have reviewed the contract between Byers and his wife and the filmmakers, and we conclude, just as the trial court did, that there is nothing in the contract to indicate that Byers was being paid to give interviews or to give testimony favorable to the State. Thus, we agree with the trial court that the contracts and their contents were irrelevant to Echols's contention regarding trial counsels' alleged conflict of interests.

### IV. Ineffective Assistance of Counsel

Echols next argues that the trial court erred in denying his claims of ineffective assistance of counsel. He asserts that trial counsel was ineffective in (1) failing to select and use appropriate expert witnesses; (2) failing to conduct a thorough *voir dire*; (3) failing to attempt to exclude testimony from an occult expert under *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); (4) failing to seek a continuance; (5) failing to seek a second change of venue; and (6) failing to present adequate mitigating evidence during the sentencing phase of the trial.

 The test for proving claims of ineffective assistance of counsel and the corresponding standard of review are well settled:

To prevail on a claim of ineffective assistance of counsel, the petitioner must show first that counsel's performance was deficient. *Jones v. State*, 340 Ark. 1, 8 S.W.3d 482 (2000); *Weaver v. State*, 339 Ark. 97, 3 S.W.3d 323 (1999). This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 99, 3 S.W.3d at 325. Petitioner must also show that the deficient performance prejudiced his defense; this requires a showing that counsel's errors were so serious as to deprive the petitioner of a fair trial. *Id.* Unless the petitioner makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversarial process that renders the result unreliable. *Chenowith v. State*, 341 Ark. 722, 19 S.W.3d 612 (2000) (*per curiam*); *Thomas v. State*, 330 Ark. 442, 954 S.W.2d 255 (1997).

The reviewing court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* To rebut this presumption, the petitioner must show that there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt respecting guilt, *i.e.*, that the decision reached would have been different absent the errors. *Id.* A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial. *Id.* In making a determination on a claim of ineffectiveness, the totality of the evidence before the factfinder must be considered. *Chenowith*, 341 Ark. 722, 19 S.W.3d 612. This court will not reverse the denial of postconviction relief unless the trial court's findings are clearly erroneous or clearly against the preponderance of the evidence. *Jones*, 340 Ark. 1, 8 S.W.3d 482; *State v. Dillard*, 338 Ark. 571, 998 S.W.2d 750 (1999).

*Coulter v. State*, 343 Ark. 22, 27, 31 S.W.3d 826, 829 (2000) (quoting *Noel v. State*, 342 Ark. 35, 38, 26 S.W.3d 123, 125 (2000)).

 Before we address the merits of each of the claims of ineffectiveness, we must address Echols's argument that we must consider the cumulative prejudicial effect of counsel's errors and omissions. To support this assertion, he relies on the holding in *Strickland*, 466 U.S. 668, that when assessing prejudice, the appellate court must consider the totality of the evidence before the factfinder. While we agree that we must consider all the evidence before the factfinder, *see Chenowith v. State*, 341 Ark. 722, 19 S.W.3d 612 (2000) (*per curiam*), we do not agree that this requires

a cumulative-error analysis. As the State points out, this court has consistently refused to recognize the doctrine of cumulative error in allegations of ineffective assistance of counsel. *See, e.g., Noel*, 342 Ark. 35, 26 S.W.3d 123; *Huddleston v. State*, 339 Ark. 266, 5 S.W.3d 46 (1999). *See also State v. Franklin*, 351 Ark. 131, 89 S.W.3d 865 (2002); *State v. Hardin*, 347 Ark. 62, 60 S.W.3d 397 (2001) (holding that it was error for the trial court to entertain a claim of cumulative error in a *Strickland* analysis).

■■■ Echols acknowledges this court's holdings; however, in his reply brief, he invites us to overrule our cases. We decline this invitation, as this court has repeatedly stated that it will not address arguments made for the first time in a reply brief. *See, e.g., Maddox v. City of Fort Smith*, 346 Ark. 209, 56 S.W.3d 375 (2001); *State v. McCormack*, 343 Ark. 285, 34 S.W.3d 735 (2000); *Stephens v. State*, 342 Ark. 151, 28 S.W.3d 260 (2000), *cert. denied*, 531 U.S. 1199 (2001). The reason for this well-settled rule is that the appellee is given no opportunity to respond to the argument. With this preliminary matter out of the way, we review the individual allegations of ineffective assistance of counsel.

*A. Failure to Develop Expert Witness Testimony*

Echols argues that trial counsel was deficient in failing to select and use appropriate experts. He contends that counsel should have attempted to secure the following experts: (1) a criminal profiler; (2) a forensic odontologist; (3) a forensic entomologist; and (4) a forensic pathologist. The trial record reflects that defense counsel had the benefit of assistance from an experienced criminal investigator, an occult expert, a psychologist, and a jury consultant.[6] The trial court found that defense counsel was not ineffective for choosing not to call other expert witnesses, as the decision regarding which witnesses to call is largely a matter of professional judgment. Moreover, the trial court found that the explanations offered by trial counsel during the Rule 37 proceedings were sound. Finally, the trial court concluded that Echols had failed to meet his burden of proof, because the experts proffered at the Rule 37 hearing were largely discredited by the State. The trial court found: "Expert swearing matches that the petitioner lost at the hearing do not support a reasonable probability that the

---

[6] The record shows that the jury consultant was actually hired by Baldwin's defense; however, Echols benefitted from the consultant's services as well.

outcome of his trial would have been different had his counsel attempted the same thing there." We cannot say that these findings are clearly erroneous.

Generally, the decision whether to call a witness is a matter of trial strategy that is outside the purview of Rule 37. *Nelson v. State*, 344 Ark. 407, 39 S.W.3d 791 (2001) (*per curiam*); *Coulter*, 343 Ark. 22, 31 S.W.3d 826. This applies to expert witnesses. *See Helton v. State*, 325 Ark. 140, 924 S.W.2d 239 (1996). When assessing an attorney's decision not to call a particular witness, it must be taken into account that the decision is largely a matter of professional judgment that experienced advocates could endlessly debate, and the fact that there was a witness or witnesses who could have offered testimony beneficial to the defense is not in itself proof of counsel's ineffectiveness. *Nelson*, 344 Ark. 407, 39 S.W.3d 791; *Johnson v. State*, 325 Ark. 44, 924 S.W.2d 233 (1996). Nonetheless, such strategic decisions must still be supported by reasonable professional judgment, pursuant to the standards set forth in *Strickland. Id.* "Judicial review of counsel's performance must be highly deferential, and a fair assessment of counsel's performance under *Strickland* requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from counsel's perspective at the time." *Thomas v. State*, 330 Ark. 442, 447, 954 S.W.2d 255, 257 (1997) (citing *Missildine v. State*, 314 Ark. 500, 863 S.W.2d 813 (1993)).

Price testified that he used an experienced criminal investigator, Ron Lax, in formulating defense strategy, including the use of experts. Price testified that he contacted a forensic pathologist, who reviewed the evidence for anything that might be helpful to the defense; however, Price did not call the pathologist at trial because he could not offer anything beneficial. Price also indicated that he chose not to call a criminologist regarding the State's only trace evidence, a red cotton fiber, because he was able to adequately challenge the evidence on cross-examination. Indeed, the trial record reflects that the State's witness conceded that the fiber was a very common one, without any unusual characteristics.

Price testified that he did not seek a forensic odontologist to examine an alleged bite mark on one of the victim's face, because he did not even recall such evidence. He said that he never saw any evidence that one or more of the victims were bitten in connection

with dying. His testimony was supported by the fact that even the experts who testified at the Rule 37 hearing could not agree that the mark was in fact a bite mark. Indeed, as the trial court found, the testimony given by Echols's experts during the postconviction proceedings was greatly discredited by the State. As such, it is unknown how such testimony would have been beneficial to Echols at trial.

██ In sum, Echols has failed to demonstrate that counsel's decision not to call additional experts was error. To the contrary, we agree with the trial court that the record shows that counsel's decisions regarding the use of experts was based on reasonable professional judgment. More significantly, even if counsel's decisions could be viewed as erroneous, Echols has failed to show a reasonable probability that the outcome of his trial would have been different. We thus affirm the trial court's ruling on this point.

### B. Ineffectiveness During Voir Dire

Echols next argues that trial counsel was ineffective during *voir dire* for failing to adequately question the jurors regarding pretrial publicity and their knowledge of Misskelley's confession. In denying relief on this claim, the trial court found that Echols had failed to prove that any juror was actually biased against him. As such, the trial court concluded that under this court's case law, Echols's claim must fail. We agree.

During the Rule 37 hearing, Price testified that every juror knew something about the case. He also testified that he had read all of the articles and knew what was in the media, thus he knew what the prospective jurors had been exposed to prior to trial. In discussing the pretrial publicity, Price stated:

> In our case there was a lot of pre-trial publicity, and the press was covering stories and trying to seek different angles.
>
> Because a lot of it initially — of course, the first month of it was about the crimes themselves, and then after that about our clients. There was a lot of negative stuff out there, but much of the stuff that was out there we couldn't really respond to until the trial. We're not trained to battle in the press to win our case there. We're trying to win in the courtroom.

> . . . [J]ust because people have heard things through the media or through rumors, if what they've heard does not comport with what they hear at the trial, sometimes it can actually be an advantage to the defendant.

When asked about how he approached *voir dire*, Price first stated that he initially requested more than twelve strikes. He further testified that in conducting *voir dire*, he used his experience from picking juries in at least sixty previous trials. He also testified that he had read a book about jury selection and used ideas from that book as well as ideas from a jury consultant that he had used in a previous case to assist him. He also testified that they utilized the services of Baldwin's jury consultant. Of principal importance, however, were his own experiences and ability to personally observe each of the prospective jurors in terms of their answers, their demeanor, and their inflections. Price testified that he used all of these things to select what he believed to be a fair and unbiased jury. This view was corroborated by the fact that Price did not use all of the peremptory challenges that were available to him.

This court will not label counsel ineffective merely because of *possible* bad tactics or strategy in selecting a jury. *See Johnson v. State*, 321 Ark. 117, 900 S.W.2d 940 (1995). Jurors are presumed unbiased and qualified to serve. *Isom v. State*, 284 Ark. 426, 682 S.W.2d 755 (1985) (*per curiam*). To prevail on an allegation of ineffective assistance of counsel with regard to jury selection, a petitioner first has the heavy burden of overcoming the presumption that jurors are unbiased. *Tackett v. State*, 284 Ark. 211, 680 S.W.2d 696 (1984) (*per curiam*). To accomplish this, a petitioner must demonstrate actual bias, and the actual bias must have been sufficient to prejudice the petitioner to the degree that he was denied a fair trial. *Id.* Bare allegations of prejudice by counsel's conduct during *voir dire* that are unsupported by any showing of actual prejudice do not establish ineffective assistance of counsel. *Hayes v. State*, 280 Ark. 509, 660 S.W.2d 648 (1983) (*per curiam*), *cert. denied*, 465 U.S. 1051 (1984).

Echols has failed to show the existence of an actual bias on the part of some or all of the jurors. The best he can do is cite to a portion of *voir dire* during which the prosecuting attorney,

Brent Davis, asked Juror Tate[7] whether she had formed any opinion regarding the guilt or innocence of the defendants based on what she had read or heard prior to trial. She stated that she had thought about the guilt or innocence of the defendants, but she indicated that her opinions were not so "fixed" that she could not listen objectively to the evidence. Echols asserts that Price's failure to ask the juror about her "fixed" opinions was error and cannot be considered as trial strategy. Price indicated during the Rule 37 proceedings that he could not remember why he had failed to follow up on her remarks. However, the record reflects that Juror Tate was ultimately excused by the trial court before Price had the opportunity to question her, because she stated that she could not set aside what she had read about the murders. It can hardly be error to fail to *voir dire* a juror that has already been struck. Accordingly, we affirm the trial court's ruling on this issue.

### C. *Expert Testimony on the Occult*

Echols next argues that trial counsel was deficient in failing to ask the trial court to hold an evidentiary hearing pursuant to *Daubert*, 509 U.S. 579, to challenge the scientific basis upon which prosecution witness Dale Griffis based his opinion that the killings manifested the trappings of occult and satanic rituals. Echols contends that Griffis's testimony was nothing more than "junk science," and that it was not admissible under the test established in *Daubert*.[8]

The trial record reflects that Baldwin's counsel moved *in limine* to keep Griffis's testimony out of the trial. Echols's counsel did not specifically join Baldwin's motion *in limine*; however, the record shows that Price did object to the admission of Griffis's testimony. During the Rule 37 hearing, Price testified that at the beginning of the trial, he did not know exactly what the State's evidence would be concerning the occult. Notwithstanding, he stated that he believed that any alleged link between the murders and the occult was ludicrous. He testified that the State's evidence

---

[7] Echols's brief erroneously identifies the speaker as Juror Roebuck.

[8] The State correctly points out that at the time of Echols's trial, in 1994, this court had not yet adopted the holding in *Daubert*. That was not done until some six years later. *See Farm Bureau Mut. Ins. Co. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000). Prior to that time, however, this court had adopted a very similar test in *Prater v. State*, 307 Ark. 180, 820 S.W.2d 429 (1991), which holding was in effect at the time of Echols's trial.

was so weak in this regard that he was content to rebut it with his own expert testimony, which would show how ludicrous the State's theory was. The record reflects that Price did object to Griffis's testimony and some of the evidence offered by the State, such as writings and a book taken from Echols's room. Ultimately, the defense presented its own witness, who was also an expert in the occult.

 Based upon the foregoing, Echols has not met his burden of showing (1) that counsel was deficient for failing to specifically attempt to keep Griffis's testimony out under *Daubert*, or (2) that but for counsel's error in this regard, there is a reasonable probability that the outcome of his trial would have been different. As this court observed in the direct appeal, there was substantial evidence to convict Echols of the crimes, most significant of which were his statements that were overheard by two girls that he had "killed the three boys," and that "I'm going to kill two more, and I already have one of them picked out." *Echols I*, 326 Ark. at 938, 936 S.W.2d at 518. Moreover, Echols made a *Daubert*-type argument on appeal, that there was no evidence to show that the field of satanism or occultism is generally accepted in the scientific community. This court rejected the argument because the trial court had not allowed Griffis's testimony as proof of the field's acceptance in the scientific community, but rather, as proof of the motive for committing the murders. This court held that the evidence was relevant to show motive pursuant to Ark. R. Evid. 404(b). *See Echols I*, 326 Ark. 917, 936 S.W.2d 509. Accordingly, we affirm on this point.

### D. Continuance

Echols next argues that trial counsel was ineffective for failing to request a continuance of his trial, in light of the fact that Misskelley's trial in nearby Clay County had been completed only two weeks earlier. In his brief on appeal, he claims that he had previously presented this claim on two distinct legal theories: (1) a conflict-of-interests theory related to the scheduled date for the release of the HBO film, and (2) a separate allegation of ineffectiveness. He claims further that the trial court's failure to rule on this latter issue, following remand from *Echols II*, was error. We disagree.

 The original briefs submitted by Echols demonstrate that the issue of counsel's ineffectiveness for failing to seek a continuance was never raised as a specific claim of error. Rather, the issue was merely raised under an introductory heading, as an example of what Echols called a "host of bizarre and contradictory" rulings by the trial court concerning decisions of trial strategy. Because this issue was not specifically raised and argued on appeal, the trial court was not required to rule on it on remand. Our directive in *Echols II* only required the trial court to make findings of fact and conclusions of law as to those issues raised by Echols on appeal. We do not view the mere mention of a claim as an example of the trial court's allegedly bizarre rulings as a specific claim for reversal. As such, the trial court did not err in failing to address this claim.

 In any event, there is no merit to this claim of ineffectiveness. As stated above, Price testified that he wanted the trial over before the film was released because he was concerned that the film's release would create even more media publicity and could lead to potential jurors having more pretrial knowledge about the case. Contrary to Echols's assertion, Price's decision does not demonstrate that he was placing the interests of the film and its makers over that of his client. Rather, under the circumstances, the decision whether to seek a continuance was a matter of trial strategy and tactics, upon which experienced advocates could endlessly debate. *See Monts v. State*, 312 Ark. 547, 851 S.W.2d 432 (1993). Moreover, as set out in the point pertaining to *voir dire*, Echols has failed to show that he was prejudiced by counsel's decision not to seek a continuance. Accordingly, we affirm on this point.

### E. Second Change of Venue

Echols next argues that trial counsel was ineffective for failing to seek a second change of venue. The record reflects that the crimes were committed in Crittenden County. A change of venue was granted in Misskelley's case to Clay County. Likewise, Echols and Baldwin received a change of venue to Craighead County. Misskelley was tried first. Part of the State's evidence against Misskelley was his custodial confession. Approximately two weeks after Misskelley's trial in Clay County, Echols and Baldwin were tried in Jonesboro, the county seat of Craighead County. Echols contends that trial counsel was deficient in failing

to ask for a second change of venue to hold the trial outside of the entire Second Judicial Circuit, of which Crittenden, Clay, and Craighead Counties are part. There is no merit to this contention.

During the Rule 37 hearing, Price testified that he thought it would be in Echols's best interest to have the trial in Jonesboro. Price explained that Jonesboro was his home town, and that he would likely know more about the potential jurors. He also stated that Jonesboro, being a college town, would likely produce jurors who were more educated and liberal, something that he believed would help the defense. He further indicated that he thought it would be beneficial to the defense that many of the jurors would have been exposed to the reports of Misskelley's trial. Price reasoned that because Misskelley's conviction had rested largely on his confession, and because the confession would not be admitted during Echols's trial, he thought that potential jurors would be less inclined to convict. Echols takes issue with this last explanation, arguing that no reasonably competent attorney would have made the same decision. Alternatively, Echols alleges that it was deficient not to seek a continuance to allow the notoriety of the case to die down. However, as the State points out, Echols's argument on this point amounts to nothing more than a hindsight attack on counsel's performance.

The bottom line is that Echols cannot show that the decision not to seek a second change of venue was anything other than trial strategy or that it prejudiced his defense. As this court has previously explained:

> The decision of whether to seek a change of venue is largely a matter of trial strategy and therefore not an issue to be debated under our post-conviction rule. *To establish that the failure to seek a change in venue amounted to ineffective assistance of counsel, a petitioner must offer some basis on which to conclude that an impartial jury was not empaneled.* Petitioner here does not specify any conduct of a juror from which it can be ascertained that the juror was unprepared to afford him an impartial hearing of the evidence. Jurors are presumed unbiased, and the burden of demonstrating actual bias is on the petitioner. The essentially conclusory allegations made by petitioner are not sufficient to overcome the presumption that the jurors were truthful when they stated that they could give the petitioner a fair trial. A defendant is not entitled to a jury totally ignorant of the facts of a case, and he is not entitled to a perfect trial, only a fair one.

*Huls v. State;* 301 Ark. 572, 580, 785 S.W.2d 467, 471-72 (1990) (*per curiam*) (citations omitted) (emphasis added). As stated above, Echols has failed to allege, let alone prove, that the jury that heard his case was biased and not impartial. Just as in *Huls,* Echols has offered nothing other than conclusory allegations that counsel was deficient for failing to seek a change of venue or continuance in his case. Accordingly, we affirm the trial court's ruling.

### F. Sentencing

Echols alleges two instances in which counsel was ineffective during sentencing. First, he claims that counsel was deficient in allowing defense expert Dr. James Moneypenny to testify regarding portions of Echols's mental health records. The trial record reflects that on cross-examination, the prosecutor asked Dr. Moneypenny to read the following excerpt from those records:

> Damien reports being told in the hospital that he could be another Charles Manson or Ted Bundy. When questioned on his feelings he states, quote, I know I'm going to influence the world. People will remember me, end quote.

The State then moved, without objection, to admit the records into evidence.

Echols now claims that trial counsel was deficient for failing to object to Dr. Moneypenny's testimony. He contends that objectively reasonable counsel would have objected to the testimony, and that the failure to do so left an image in the jurors' minds of Echols as a calculating mass-murderer or serial killer. The State correctly points out that this claim was not raised in Echols's petition; however, as stated above, because Echols was sentenced to death, it may be raised for the first time on appeal if prejudice is conclusively shown. *See Jones v. State,* 340 Ark. 1, 8 S.W.3d 482 (2000); *Johnson,* 321 Ark. 117, 900 S.W.2d 940. For the reasons outlined below, however, Echols has failed to conclusively show any prejudice.

During the Rule 37 proceedings, Price testified that the decision not to object to the foregoing testimony was a strategic and tactical one. He explained that he believed that it was beneficial to the defense in mitigation that the jurors know the extent of Echols's mental health problems. Matters of trial strategy and tactics, even if arguably improvident, fall within the realm of

counsel's professional judgment and are not grounds for a finding of ineffective assistance of counsel. *Noel*, 342 Ark. 35, 26 S.W.3d 123. Thus, even though another attorney may have chosen a different course of action, trial strategy, even if it proves unsuccessful, is a matter of professional judgment. *Id*. Echols is thus entitled to no relief.

Echols next argues that counsel was unprepared to present mitigating evidence on his behalf, and that the failure to present evidence in mitigation amounted to ineffective assistance of counsel. We disagree.

 Counsel's failure to investigate and present substantial mitigating evidence during the sentencing phase may constitute ineffective assistance of counsel. *Coulter*, 343 Ark. 22, 31 S.W.3d 826. *See also Williams v. Taylor*, 529 U.S. 362 (2000); *Sanford v. State*, 342 Ark. 22, 25 S.W.3d 414 (2000). Counsel is obligated to conduct an investigation for the purpose of ascertaining mitigating evidence, and the failure to do so is error. *Coulter*, 343 Ark. 22, 31 S.W.3d 826. Such error, however, does not automatically require reversal unless it is shown that, but for counsel's errors, there is a reasonable probability that the sentence would have been different. *Id*. When reviewing a claim of ineffectiveness based upon failing to present adequate mitigating evidence, we view the totality of the evidence — both that adduced at trial and that adduced in the postconviction proceeding. *Id*.

 Here, Echols does not identify what mitigating evidence should have been presented by counsel. The trial record reflects that three witnesses were called by the defense in mitigation: Joe Hutchinson, Echols's natural father; Jack Echols, Echols's adoptive father; and Dr. Moneypenny. All three witnesses testified about Echols's difficult childhood, his repeated bouts with depression, and other mental problems he suffered. As a result of this testimony, the jury found two mitigating circumstances: (1) the murders were committed while Echols was under extreme mental or emotional disturbance; and (2) the murders were committed while Echols was acting under unusual pressures or influences or under the domination of another person. In light of the foregoing, we cannot say that counsel failed to properly present mitigating evidence.

Affirmed.