

Cite as 2014 Ark. 39

# SUPREME COURT OF ARKANSAS

No. CR–12–157

| | | |
|---|---|---|
| MARCUS L. RACKLEY | | **Opinion Delivered** January 30, 2014 |
| | APPELLANT | |
| | | APPEAL FROM THE FAULKNER |
| V. | | COUNTY CIRCUIT COURT |
| | | [NO. 23CR-05-26] |
| STATE OF ARKANSAS | | HONORABLE DAVID L. |
| | APPELLEE | REYNOLDS, JUDGE |
| | | <u>REVERSED AND REMANDED</u>. |

**CLIFF HOOFMAN, Associate Justice**

Appellant Marcus Rackley appeals after a Faulkner County Circuit Court denied his petition filed pursuant to Arkansas Rule of Criminal Procedure 37.1. On appeal, appellant contends that trial counsel was ineffective (1) because he was simultaneously representing appellant and appellant's wife at the time of appellant's trial, and the dual representation created an actual conflict of interest that adversely affected counsel's performance; (2) because he failed to object to the introduction of the out–of–court statements made by appellant's wife; (3) because he was incapacitated due to the medication he was taking during the trial; (4) because he failed to object to statements given by Prosecuting Attorney Foster during voir dire; (5) because he failed to comply with witness sequestration rules under the Arkansas Rules of Evidence; and (6) because he failed to properly handle the issue of whether certain sexual messages sent to and from the victim could be admitted during trial. This court

SLIP OPINION

assumed jurisdiction of this appeal pursuant to Arkansas Rule of Criminal Procedure 37.1 and Arkansas Supreme Court Rule 1-2(a)(8) as this involves postconviction relief. We reverse and remand for a new trial with conflict-free counsel.

Since this is an appeal from the denial of a postconviction petition, only a brief recitation of the facts regarding the underlying criminal conviction is necessary. Appellant was charged with thirty-seven various sex offenses, including charges of rape, incest, second-degree sexual assault, and first-degree sexual abuse, that stemmed from allegations that appellant had repeatedly sexually molested his stepdaughter, T.W., between 2001 and 2004. T.W.'s mother, Mrs. Cynthia Walters, formerly Mrs. Cynthia Rackley and appellant's wife at the time of trial, also was faced with charges stemming from appellant's sexual abuse of T.W. Appellant's attorney, Mr. Max Horner, simultaneously represented both the appellant and Mrs. Walters. Appellant's proceedings preceded the resolution of Mrs. Walters's charges. A Faulkner County jury convicted appellant of all counts and sentenced him to a total of thirty-seven years in the Arkansas Department of Correction.

Appellant timely appealed his convictions, and this court affirmed. *Rackley v. State*, 371 Ark. 438, 267 S.W.3d 578 (2007). After appellant filed a timely, verified petition for postconviction relief pursuant to Arkansas Rule of Criminal Procedure 37.1, the trial court initially entered an order denying relief without an evidentiary hearing. Subsequently, this court reversed and remanded for the trial court to comply with Arkansas Rule of Criminal Procedure 37.3. *Rackley v. State*, 2010 Ark. 469 (per curiam). After a hearing, the trial court filed a written order again denying appellant's Rule 37 proceedings on October 14, 2011.



This appeal followed.

Appellant's first point on appeal is that trial counsel was ineffective because he was simultaneously representing appellant and appellant's wife at the time of appellant's trial and that the dual-representation created an actual conflict that adversely affected counsel's performance. He further alleges that the trial court erred in failing to grant him relief because conflict-free counsel could have had appellant's former wife explain or deny the damaging statements said to have been made by her to Ms. Luebke and Ms. Thessing that were admitted at trial. In appeals of postconviction proceedings, this court will not reverse a trial court's decision granting or denying postconviction relief unless it is clearly erroneous. *Johnson v. State*, 356 Ark. 534, 157 S.W.3d 151 (2004); *Howard v. State*, 367 Ark. 18, 238 S.W.3d 24 (2006). A finding is clearly erroneous when, although there is evidence to support it, the appellate court, after reviewing the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *Howard, supra*.

To prevail on a claim of ineffectiveness based on counsel's conflict of interest, appellant must demonstrate the existence of an actual conflict of interest that affected counsel's performance, as opposed to a mere theoretical division of loyalties. *Echols v. State*, 354 Ark. 530, 127 S.W.3d 486 (2003) (citing *Mickens v. Taylor*, 535 U.S. 162 (2002)). Appellant has the burden of proving a conflict of interest and showing its adverse effects. *Johnson v. State*, 321 Ark. 117, 900 S.W.2d 940 (1995). However, "a defendant who shows that a conflict of interest *actually affected the adequacy of his representation* need not demonstrate prejudice in order to obtain relief." *Id.* at 493, 127 S.W.3d at 493 (quoting *Mickens, supra* (quoting *Cuyler v.*

*Sullivan*, 446 U.S. 335 (1980))).

It is undisputed that Mr. Horner simultaneously represented appellant and Mrs. Walters at the time of appellant's trial. In a hearing prior to trial, Mr. Horner represented to the court that his client, Mrs. Walters, would be invoking her Fifth Amendment right to remain silent upon advice of counsel and sought to prohibit any out-of-court statements made by Mrs. Walters. After the State expressed to the court that it had a right to place her on the stand first, to ask her nonincriminating questions, and to then see if she would invoke her Fifth Amendment Right on the stand, Mr. Horner objected and stated the following:

> Your Honor, I think that would be highly prejudicial to my client to put her up there and for her to say, you know, I'm invoking my Fifth Amendment rights. If she invokes her Fifth Amendment right, it goes to all testimony not just the testimony that is incriminating to her. Her testimony in total would be inadmissible. I also represent Mrs. Rackley and I can tell you that is what she is going to say.

After the hearing, the trial court ultimately allowed her to be called to the stand by the State outside the presence of the jury to invoke her Fifth Amendment right and ruled that testimony regarding statements that Mrs. Walters made to Ms. Luebke and Ms. Thessing were admissible.

After reviewing the testimony by Ms. Luebke and Ms. Thessing at trial, there is no doubt that their testimony was damaging to the appellant. At trial, Ms. Luebke testified that T.W. and her daughter were friends. She testified that T.W. had stayed with her periodically between December and February or March. Ms. Luebke reported the alleged sexual abuse to the Faulkner County Sheriff's Office after her daughter informed her that T.W. had told her that she was being abused. After filing the report and while T.W. was in her home, Ms.

Luebke testified on direct examination by the State that she had the following conversation

with Mrs. Walters:

> [T.W.] advised me her mother was going to call back in ten minutes. She ask me would I speak to her because she did not wish to speak to her at that point. I told [T.W.], yes, I would. Approximately ten minutes later, Cindy Rackley did call back and I answered [T.W.]'s cell phone. Cindy said, or actually I said, "Cindy, [T.W.] is upset, she really doesn't want to talk to you at this time. Obviously you are aware that I have filed the report." And Cindy said that ---- that they were having family problems. I said, "I know that you are having family problems and it was my understanding that you had tried to find a home, a place for you and [T.W.] and Matt to live." She said yes, that she was having financial problems, that everything was in Mark Rackley's name and she was not financially able to get away at that time. She was waiting on her income tax return to come in. She said that Mark had come to her saying that he had inappropriate sexual feelings toward [T.W.] but that [T.W. also] had feelings toward Mark and I said, "Well, Cindy, what did you tell [T.W.]?" And she said, "I said, it is okay Baby, it is not like you are related." At that time I changed the subject back to asking her to please just allow [T.W.] to spend the night because I had told her that if she or Mark tried to come to get [T.W.] that I was told I would have to call the police and she agreed to let [T.W.] spend the night. Then after that phone conversation, we went down to Bobby Brown's, to the investigator's office and [T.W.] made her statement to Investigator Brown.

Ms. Thessing testified at trial that she was a friend of Mrs. Walters. She also testified

as follows during direct examination by the State regarding statements that Mrs. Walters made

to her regarding the sexual abuse:

> A. Cindy said that she needed to speak to me, but she didn't want to talk to me over the phone, and I asked what was going on, what was wrong. It was either probably a Saturday or Sunday. My little girl had had a ballgame that day.
>
> I said that they could come over. I needed to find someone to see if my little girl could catch a ride with someone to the ballgame, and then I called her back and said that that was fine for them to come ahead over. And she was really, really upset, and she said [T.W.] was with her.
>
> She did come over. I – and my first thoughts were that [T.W.] was pregnant, and she said, "No, it's not [T.W.]. It's Mark."
>
> And I said, "Is he hurt?"
>
> And she said, "No." She said, "I don't want to talk about it on the phone.

We'll be there in a little bit."

So they – [T.W.] and Cindy came to my house.  And Betsy, my oldest daughter, left for her ballgame with a friend.  And [T.W.] was obviously very upset.  Her eyes were just swollen horribly, and she – Cindy asked her did she want to tell me what was going on or did she want her.  And [T.W.] said that Mark had been messing around with her.

Q.  And what did Cindy say to you with regard to anything Mark had said her – associated with all that?

A.  Well, we had talked to [T.W.] – or had explained to me a lot of things that had been going on.  And Cindy said that Mark and [T.W.] that morning had told her what had been going on not only that morning, but in the past about oral sex and that he had told her she looked so much like – so much like Cindy when she was younger.

Q.  When you were talking about – or when you just said that not only that day, but before, what did you mean?  You were talking about a conversation – or them telling Cindy what was going on.  What were you talking about had gone on before?

A.  I'm not real sure how to word it, but the sexual conduct that had been going on between them, Mark's visits into [T.W.]'s room, what had been going on –

Q.  Now –

A.  – and –

Q.  I'm sorry.

A.  Go ahead.

Q.  Well, was this stuff that Cindy was saying to you or –

A.  That Cindy said Mark had told her that morning.

Q.  Okay.  No – and it was – it was kind of hard to follow.  You started talking about some comment that she looks so much like Cindy when she was younger.  Can you – just for clarification, instead of using a pronoun like she, try to use a name so everybody can follow along.

A.  That Mark had told Cindy that [T.W.] looked so much like Cindy when Cindy was younger.  "He was kind of having the best of both worlds" was the exact term she used.

. . . .

A.  My understanding was before they left that they were going to go there to the police station, that they were going to go to the police before they went home.

Q.  And do you know whether they did that or not?

A.  No, they did not.

At the postconviction Rule 37 hearing, Mrs. Walters testified that she and appellant paid a joint fee for Mr. Horner's representation.  She also said that she invoked her Fifth Amendment right after Mr. Horner told her to do so and that Mr. Horner did not prepare

her to testify for appellant's trial. She testified that it was a confusing time for her and that since Mr. Horner told her that her testimony could hurt her later, she took the advice of her attorney, whom she thought she could trust to help her. On cross-examination, Mrs. Walters testified that her understanding was that Mr. Horner was afraid that if she testified at trial that things could be misconstrued and used against her as she would be tried as well. She testified that at times she felt that Mr. Horner was trying to assist appellant more than her and at other times, he would assist her more than appellant. She testified that she did not remember specifically making a statement to Investigator Bobby Brown that her intention was to "handle this in-house." However, she testified that the investigator must have taken her comments out of context.

At the Rule 37 hearing before the trial court, with regard to Ms. Luebke's testimony, Mrs. Walters testified that had she testified at trial, she would have explained that she did tell Ms. Luebke that there were problems at home. However, the problems were not with appellant but with her daughter's overage boyfriend. Additionally, she testified that she did tell Ms. Luebke that she was having financial issues and that she had talked about separating from appellant. She also testified that she would have testified that she never made any statements regarding inappropriate sexual feelings that appellant had for T.W. She testified that she would have clarified to the jury that her conversation with Ms. Luebke referred to T.W.'s relationship with her overage boyfriend.

With regard to Ms. Thessing's testimony at trial, Mrs. Walters testified that had she testified at trial, she would have testified that some of the statements made by Ms. Thessing

were "blatant lies." While people have told her that T.W. looked like her when she was younger and appellant had said that T.W. looked like her in high school, she testified that appellant never said "he was kind of having the best of both worlds." Furthermore, she testified that she never made a statement like that to Ms. Thessing. As to the testimony that Ms. Thessing gave that Mrs. Walters was "upset this had been going on and that this could happen, that [appellant] would do this," Mrs. Walters testified that she was referring to her discussions with appellant regarding a divorce. She testified that appellant had discussed taking everything in a divorce proceeding and leaving her with nothing, and she could not believe that he would do that to her. She further explained that Ms. Thessing had taken her statements out of context.

At the postconviction hearing, Mr. Horner testified that appellant and Mrs. Walters came to him prior to charges being filed against them and that he agreed to represent them. In preparation for trial, Mr. Horner testified that he was concerned with statements Mrs. Walters made to the police and determined that it was not in appellant's best interest for Mrs. Walters to testify. He further testified that he never intended to have her testify and that this decision was part of his trial strategy. He did not ask her whether she agreed with the decision because it was not her trial. On cross-examination, Mr. Horner testified that he did not remember whether Mrs. Walters ever took the stand. He further testified that he believed that "[t]hey were unified throughout. In other words, they both maintained that ever[y] statement that was ever made was misunderstood or mis-perceived by the person whoever was reporting that particular thing." Furthermore, Mr. Horner admitted that there was an

actual conflict of interest but explained that his clients agreed to the conflict, and his decision to not have her testify "would have been the decision regardless of who was her attorney." However, he did not produce any written documentation that appellant consented to the conflict of interest, as required by Arkansas Rule of Professional Conduct 1.7. There is no doubt that an actual conflict of interest was involved under the circumstances in this case, after reviewing the rule and Mr. Horner's testimony. Therefore, the remaining question is whether the conflict of interest adversely affected counsel's performance. *See Sheridan v. State*, 331 Ark. 1, 959 S.W.2d 29 (1998).

While the State argues in its brief that the conflict of interest did not adversely affect Mr. Horner's performance because appellant's claim is not supported by proof and because Mr. Horner's advice to Mrs. Walters would have been the same regardless of whether he was her attorney, we disagree. Because Mr. Horner was required under his ethical obligation to adequately represent both clients' interests, even if conflicting, he was not free to explore all avenues in developing his trial strategy to present the best possible defense for appellant at trial. In developing his impeded trial strategy, Mr. Horner ethically could not ignore the fact that Mrs. Walters' testimony, whether favorable to appellant or not, could further implicate her as well. Therefore, even though he testified that he believed that her interests were "united" with appellant's, he was faced with the ethical dilemma of representing two clients simultaneously who had conflicting interests.

Additionally, even assuming that he had decided not to call Mrs. Walters as a witness, the State clearly sought to do so. If he had not advised her to exercise her own personal Fifth

Amendment right, he would have been placed in the awkward position to cross-examine his own client to aid his other client. Instead, Mr. Horner chose to not cross-examine Mrs. Walters or have Mrs. Walters present any explanation or denial of the damaging testimony. "Thus, the record in the instant case 'luminates the cross-purposes under which defense counsel was laboring.'" *Sheridan*, *supra* (quoting *Glasser v. United States*, 315 U.S. 60 (1942)). Because Mr. Horner was prevented from developing an unimpeded trial strategy that was in appellant's best interest, the actual conflict of interest adversely affected counsel's performance, and we reverse and remand this case for a new trial. Because we reverse and remand for a new trial, it is unnecessary to examine the remaining allegations of ineffective assistance of counsel, as in all probability they will not recur during the course of a subsequent trial. *See Sheridan*, *supra*.

Reversed and remanded.

*Marcus L. Rackley*, pro se appellant.

*Dustin McDaniel*, Att'y Gen., by: *Vada Berger*, Ass't Att'y Gen., for appellee.

SLIP OPINION