NOT DESIGNATED FOR PUBLICATION

No. 118,451

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SANTIAGO SOLA-MORALES,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JAMES R. FLEETWOOD, judge. Opinion filed November 15, 2019. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., MALONE and LEBEN, JJ.

ATCHESON, J.: This appeal is the latest chapter in Santiago Sola-Morales' original habeas corpus action challenging his conviction for voluntary manslaughter in a 2006 jury trial in Sedgwick County District Court. Five years after the guilty verdict, we affirmed the district court's denial of Sola-Morales' motion for relief under K.S.A. 60-1507 without an evidentiary hearing. *Sola-Morales v. State*, No. 104,388, 2011 WL 4440414 (Kan. App. 2011) (unpublished opinion). On review, the Kansas Supreme Court reversed and remanded the motion to the district court for an evidentiary hearing on two

1

issues arising from Roger Falk's performance as Sola-Morales' lawyer leading up to and during the jury trial: (1) The failure to call Stephen Peterson as a witness at trial; and (2) whether a series of trial continuances that Falk obtained and a motion to dismiss that Sola-Morales personally filed created an actual conflict between him and Falk and, if so, what effect that may have had on the quality of the legal representation. *Sola-Morales v. State*, 300 Kan. 875, 898-99, 335 P.3d 1162 (2014).

The district court held an evidentiary hearing in June 2015 and, after a request for more detailed findings, entered a lengthy journal entry in May 2017 denying Sola-Morales any relief. Sola-Morales has appealed, now bringing his habeas corpus challenge to us for a second time. As we explain, Sola-Morales has effectively abandoned his claim regarding Peterson, and the district court's factual findings, including credibility determinations, undercut his claim rooted in the continuances and the motion to dismiss. Even if the dispute about the continuances and the motion created an actual conflict between Sola-Morales and Falk, that would not have translated into legal prejudice requiring reversal of the jury verdict. We, therefore, affirm the district court.

FACTUAL AND PROCEDURAL HISTORY

The extended history of the underlying direct criminal case and this 60-1507 proceeding belie the comparatively straightforward disposition of the two issues the Kansas Supreme Court identified and the district court addressed on remand, especially as we now consider them on appellate review. We outline that background as necessary to place our discussion in context.

In the criminal case, the State charged Sola-Morales with intentional second-degree murder in the March 2005 shooting of Frank Sibat. Sibat was fatally shot once in the chest in the living room of his Wichita home. Police investigators found living room furniture broken and in disarray, consistent with a physical struggle. Sibat had numerous

2

injuries indicative of an extended fight or beating. At trial, the forensic pathologist who autopsied Sibat's body testified that the fatal shot would have been fired from at least several feet away given the absence of stippling on the body and of any other gunpowder residue. Postmortem testing showed Sibat had alcohol and cocaine in his system when he died.

Immediately after the shooting, Sola-Morales left Wichita. The next morning the Wichita police received information that Sola-Morales was involved in a shooting and had boarded a bus for Miami. Based on that tip, the Wichita police had authorities in Nashville, Tennessee, take Sola-Morales into custody at the bus station there. Detectives from the Wichita police department questioned Sola-Morales in Nashville before transporting him back. Sola-Morales initially told the detectives he had been at Sibat's home. He said he and Sibat had been drinking for several hours, and while he was in the bathroom, a man he knew as Rubin arrived. According to Sola-Morales, Rubin pointed a handgun at Sibat and fired. Rubin then tried to shoot Sola-Morales but the gun jammed or misfired. And Sola-Morales told the detectives Rubin fled.

One of the detectives commented on a 4-inch scratch on Sola-Morales' neck. Sola-Morales explained he had leaned over Sibat, who grabbed him in an effort to get up and go after Rubin. Although Sibat had been shot, Sola-Morales told the detectives he concluded the wound was not especially serious. He said he then went home, told his wife he was in trouble, disposed of the clothes he had been wearing, and went to work. According to Sola-Morales, he told a coworker what had happened, and the coworker later drove him to the bus station. Sola-Morales advised the detectives he had no injuries other than the scratch.

After a short break, the detectives told Sola-Morales the account he had just given them didn't fit with the information they had received. Sola-Morales then offered a second version in which Sibat came at him when he returned from the bathroom. The two

fought, and Sibat reached for a handgun he had in the waistband of his pants. In this version, Sola-Morales and Sibat were on the floor wrestling for control of the gun when it discharged, fatally injuring Sibat. Sola-Morales said he took the gun and left. The rest of the second narrative basically matched the first with the added detail that Sola-Morales also disposed of the handgun.

On the trip back from Nashville to Wichita, Sola-Morales offered the detectives a third version of the shooting. He told the detectives Sibat drew the handgun and pointed it at him. But he said he was able to wrestle the gun away from Sibat and to step back. Sibat then said he intended to kill Sola-Morales and began moving forward. Sola-Morales explained he fired one shot ostensibly in self-defense. Again, Sola-Morales said he left with the gun and later got rid of it.

During the trial in late March 2006, the State had the lead detective tell the jury about all three of Sola-Morales' versions of the shooting and describe his appearance at the time, including the scratch on his neck. Investigators were never able to find the handgun or the clothing Sola-Morales said he discarded. Sola-Morales' coworker testified at trial during the State's case. The coworker told the jury Sola-Morales first said he had killed a man but later said he had only injured him. According to the coworker, Sola-Morales explained there was a fight over a gun and the other man got shot.

Sola-Morales did not testify in his own defense at the criminal trial, and Falk presented no other witnesses. The jury convicted Sola-Morales of the lesser crime of voluntary manslaughter.

At a later hearing, the district court ordered Sola-Morales to serve 216 months in prison, a standard guidelines sentence based on his criminal history. Sola-Morales filed a direct appeal, and this court affirmed the conviction and prison sentence. *State v. Sola-*

4

*Morales*, No. 97,011, 2008 WL 2510154 (Kan. App. 2008) (unpublished opinion). He then timely filed his habeas corpus motion under K.S.A. 60-1507.

We now double back to fill in the procedural markers bearing on the issues before us in this appeal. After the district court appointed Falk to represent Sola-Morales in the underlying criminal case in April 2005, he delegated significant responsibilities to another lawyer in his office. When that lawyer left the office later in the year, Falk resumed full representation of Sola-Morales. In the meantime, the public defender office serving Sedgwick County was overextended with the representation of a man charged (and later convicted) as the notorious serial killer BTK. To help alleviate that situation, the agency asked and Falk agreed to take appointments in about half a dozen major felony cases. Falk's wife was later diagnosed with cancer in 2005 and underwent surgery and received other treatment from then through Sola-Morales' jury trial.

Falk requested and received six continuances of Sola-Morales' trial date that spanned late June 2005 to late March 2006. Everybody agrees the State requested no continuances of the trial during that period. The circumstances surrounding the six continuances are at the center of Sola-Morales' complaint that Falk had a conflict of interest compromising their lawyer-client relationship and impairing the representation he received during the trial.

Even under the best conditions, reconstructing those circumstances at the 60-1507 hearing—some nine years later—would have been challenging. In this case, the challenge was compounded because Falk could produce only a fragment of his office file on Sola-Morales' criminal case. Some of the file had been created and stored electronically and was later lost in a computer crash. Much of the paper file had been archived without being catalogued and could not be found. The hearing transcript suggests Falk had some remnants from his file and Sola-Morales had copies of filings and other materials Falk had provided to him years earlier. At the 60-1507 hearing, Falk acknowledged he did not

5

have a detailed recollection of his communications with Sola-Morales leading up to the jury trial and had few documents to review to refresh his memory.

Before the jury trial, Sola-Morales was detained at the Sedgwick County jail. Falk does not speak Spanish, and he did not consider Sola-Morales to be particularly fluent in English. So they typically communicated using a translator. Falk testified that as a result, he rarely spoke to Sola-Morales by telephone and relied on face-to-face meetings at the jail or relaying general information through Jackie Duarte, Sola-Morales' bilingual wife. Falk testified that he believed he spoke with Sola-Morales about each of the six continuances and explained he requested them because of his overall caseload. When Falk was shown visitor logs from the jail indicating he had not seen Sola-Morales at times corresponding to the requested continuances, he deferred to the accuracy of those records.

At the 60-1507 hearing, Sola-Morales admitted as evidence letters from Falk's office to him dated May 6, 2005; June 21, 2005; December 12, 2005; and February 10, 2006. The first three are form letters stating that the current trial date had been continued and informing Sola-Morales of the new trial date. Each letter uses the passive voice to refer to the continuance—"your trial has been continued"—and, therefore, does not indicate whether the State or Falk requested the additional time. The last letter included an additional sentence stating Falk was starting a jury trial in a rape case on the same date that Sola-Morales' trial had been scheduled, so he needed to continue Sola-Morales' trial.

On February 21, 2006, Sola-Morales filed a pro se motion to dismiss the criminal case on the grounds the State received continuances that violated his statutory speedy trial rights under K.S.A. 22-3402. The motion refers generically to the trial continuances purportedly granted the State and otherwise largely recites the statutory language. The motion mentions a violation of Sola-Morales' constitutional right to a speedy trial preserved in the Sixth Amendment to the United States Constitution but does not

6

otherwise argue that claim. The record in the criminal case shows the motion to dismiss was withdrawn before trial, so the district court never ruled on it.

The 60-1507 hearing produced conflicting accounts of this procedural history. Falk testified that he never told Sola-Morales the State continued the trial settings. Falk said he and Sola-Morales discussed the pro se motion to dismiss. According to Falk, he explained to Sola-Morales the motion was meritless because the State hadn't requested the continuances. Falk testified that after their discussion, Sola-Morales authorized him to withdraw the motion without a hearing.

Sola-Morales testified that Falk had told him the State asked for the trial continuances. Sola-Morales then explained that another inmate helped him draft the motion to dismiss, and they relied, in part, on the letters from Falk's office in concluding the State had sought and received continuances. Sola-Morales testified he was brought to a holding cell for a hearing on his motion to dismiss but never appeared in court and Falk later told him the district court had denied the motion. Sola-Morales said he did not consent to withdrawing the motion to dismiss.

At the 60-1507 hearing, Sola-Morales never testified that he instructed Falk to oppose any trial continuances or to insist on an immediate trial setting. Nor did he testify that he personally would have opposed any or all of the continuances Falk requested if he had been present in the district court. Sola-Morales did testify that had he known Falk would request multiple continuances, he would have asked the district court to appoint another lawyer to represent him.

We turn to the matter of Peterson as a possible trial witness. The record shows Falk obtained an order from the district court to transport Peterson from the state prison in El Dorado to the Sedgwick County jail so he could testify as a witness during the trial. At a hearing before Peterson was to appear, Falk represented to the district court he

7

intended to have Peterson testify about Sibat's violent character by describing specific instances of conduct. The State objected, and the district court ruled that specific instance testimony was inadmissible to prove a character trait, such as a violent disposition. The district court did not preclude opinion or reputation evidence about Sibat's character. See K.S.A. 60-447. In light of that ruling, Falk did not call Peterson as a witness during the jury trial. Sola-Morales challenged the exclusion of Peterson's specific instance testimony in his direct appeal in the criminal case. We affirmed the ruling based on settled precedent. *Sola-Morales*, 2008 WL 2510154, at *5-6.

At the 60-1507 hearing, Falk testified that he decided against calling Peterson as a witness solely to offer opinion or reputation evidence about Sibat's character, since other trial evidence suggested Sibat had a violent disposition. Peterson did not appear at the 60-1507 hearing to establish what he, in fact, might have testified to if he had been called as a witness in the criminal case.

In a short bench ruling at the conclusion of the hearing, the district court characterized Falk's decision against calling Peterson as a trial witness as a reasoned strategic choice. Taking up the second issue, the district court identified "a conflict" between Sola-Morales as a result of their "lack of communication on continuances." That lack of communication and the resulting conflict encompassed Sola-Morales' inability to voice any objection to the continuances in open court. The district court declined to label "the lack of regular communication" an ethical violation and concluded Falk's handling of the case did not deprive Sola-Morales of a fair trial. After receiving written submissions from Sola-Morales and the State, the district court issued a two-page journal entry in May 2016 denying Sola-Morales relief. Without any real analysis, the district court reiterated that Falk did not provide constitutionally ineffective legal representation in failing to communicate with Sola-Morales about the trial continuances or in deciding against calling Peterson as a trial witness.

8

Sola-Morales filed a motion to alter or amend the district court's judgment coupled with a request for more detailed findings and conclusions. The district court heard argument from the lawyers in December 2016 and requested additional written submissions from the parties. Sola-Morales' lawyer filed a response in March 2017, and the State responded in May 2017. Ten days later, the district court filed a nine-page journal entry that in all material respects tracked the State's submission word for word.

In that journal entry, the district court—borrowing the State's language—explicitly addressed and resolved the conflicting testimony from Sola-Morales and Falk about the reasons given for the continuances and the handling of the pro se motion to dismiss for a speedy trial violation. The district court found Sola-Morales failed to establish that Falk lied about the reasons for the continuance or the withdrawal of the motion. On that point, the district court stated: "Falk's testimony . . . is more credible than the evidence presented by movant." That evidence, of course, consisted principally of Sola-Morales' own testimony at the 60-1507 hearing. The district court acknowledged that Falk was mistaken in testifying that he spoke to Sola-Morales about each of the six continuances— an error the district court attributed to the nine-year lapse between the events and the hearing. The district court rejected that mistaken testimony as material evidence of "malfeasance by Falk." The district court recognized that Falk "did not regularly communicate with [Sola-Morales] about each continuance" and characterized that as "a potential conflict of interest," thus softening what it had said in the bench ruling and the earlier journal entry. The district court also restated that Falk's decision against calling Peterson as a witness entailed a reasoned strategic call.

The district court denied Sola-Morales relief. And he has appealed that ruling.

9

*1. Peterson as a Trial Witness*

We first take up the matter of Peterson as a potential trial witness. The point is governed by the general legal principles applicable to habeas corpus relief under K.S.A. 60-1507. When we review the denial of a 60-1507 motion after a full evidentiary hearing, we accept the district court's findings of fact to the extent they are supported with substantial competent evidence. But we exercise unlimited review of the determinative legal issues. *Bellamy v. State*, 285 Kan. 346, 355, 172 P.3d 10 (2007).

To prevail on this aspect of his 60-1507 motion, Sola-Morales must show both that Falk's legal representation fell below the objective standard of reasonable competence guaranteed by the Sixth Amendment right to counsel and that absent the substandard lawyering there probably would have been a different outcome in the criminal case. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Sola-Morales*, 300 Kan. at 882; see *Chamberlain v. State*, 236 Kan. 650, Syl. ¶¶ 3, 4, 694 P.2d 468 (1985) (adopting and stating *Strickland* test for ineffective assistance). A reasonable probability of a different outcome "undermine[s] confidence" in the result and marks the criminal proceeding as fundamentally unfair. See *Strickland*, 466 U.S. at 694. Sola-Morales, then, must prove both constitutionally inadequate representation and sufficient prejudice attributable to that representation to materially question the voluntary manslaughter conviction.

As the United States Supreme Court and the Kansas Supreme Court have stressed, review of the representation should be deferential and hindsight criticism tempered lest the evaluation of a lawyer's performance be unduly colored by lack of success notwithstanding demonstrable competence. See *Strickland*, 466 U.S. at 689-90; *Holmes v. State*, 292 Kan. 271, 275, 252 P.3d 573 (2011). Rarely should a lawyer's representation

10

be considered substandard when he or she investigates the client's circumstances and then makes a deliberate strategic choice among arguably suitable options. *Strickland*, 466 U.S. at 690-91. Whether a lawyer had made reasoned strategic decisions bears on the competence component of the *Strickland* test.

Regardless of the inadequacy of legal representation, a 60-1507 motion fails if the movant cannot establish substantial prejudice. And the district court properly may deny a motion that falters on the prejudice component of the *Strickland* test without assessing the sufficiency of the representation. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); see *Edgar v. State*, 294 Kan. 828, 843-44, 283 P.3d 152 (2012); *Oliver v. State*, No. 106,532, 2013 WL 2395273, at *5 (Kan. App. 2013) (unpublished opinion). In other words, even assuming a criminal defendant's legal representation fell below the Sixth Amendment standard, he or she is not entitled to habeas corpus relief if the result would have been no different with competent counsel.

The evidence presented at the 60-1507 hearing shows Falk had considered Peterson as a potential trial witness and had taken steps to secure his presence for that purpose. Falk testified that after the district court ruled Peterson could not testify to specific instances of Sibat's violent disposition, he made a calculated decision not to call Peterson as a witness. He concluded opinion or reputation testimony from Peterson about Sibat's character would be redundant of other evidence and not especially persuasive to the jury. The district court found Falk's decision to be a legitimate strategic determination and, thus, consistent with constitutionally adequate representation under the first part of the *Strickland* test.

The district court also concluded that Sola-Morales failed to establish the outcome of the criminal trial might have been different, since Peterson did not testify at the 60-1507 hearing. Without that testimony, Sola-Morales could not establish what Peterson

11

would have told the jury either about his opinion of Sibat's character or about Sibat's reputation. In turn, the district court had no way to gauge how that evidence might have affected the trial.

Under the circumstances, the district court correctly found Sola-Morales did not establish any legal basis to set aside his conviction because of Falk's decision against calling Peterson as a witness at trial. The district court's conclusion that Sola-Morales failed to establish material prejudice is itself legally sufficient to affirm the ruling. See *State v. Burnett*, 300 Kan. 419, 455, 329 P.3d 1169 (2014) (habeas corpus relief properly denied when movant fails to produce as witnesses at 60-1507 hearing persons who purportedly would have provided exculpatory testimony at criminal trial); *Tatum v. State*, No. 110,299, 2015 WL 4486775, at *12 (Kan. App. 2015) (unpublished opinion). As we have said, Sola-Morales has effectively conceded this point on appeal and offers no argument for reversing the district court's ruling.

## 2. Falk's Purported Conflict of Interest

### 2A. Legal Principles

A criminal defendant may obtain relief in a habeas corpus action if his or her lawyer in the underlying case labored under an "active" conflict of interest and the defendant either unsuccessfully objected to the representation at the time or can show the conflict compromised the representation. *State v. McDaniel*, 306 Kan. 595, 609, 395 P.3d 429 (2017). Criminal defendants are constitutionally entitled to be represented by lawyers who have no conflicts of interest that would divert them from fully advocating on their clients' behalf. *Sola-Morales*, 300 Kan. at 883; *State v. Bowen*, 299 Kan. 339, 343, 323 P.3d 853 (2014). Such a conflict impinges on the Sixth Amendment right to counsel. *Mickens v. Taylor*, 535 U.S. 162, 166-67, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002); *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980).

12

Relying on *Mickens*, the Kansas Supreme Court has recognized three categories of active conflicts of interest in criminal cases: (1) the district court permits a lawyer to represent multiple clients with antagonistic interests in the same proceeding despite an objection to the representation; (2) a lawyer represents multiple clients but no objection has been lodged; and (3) the representation of a current client conflicts either with a duty owed a former client or with the lawyer's own personal or financial interests. *Sola-Morales*, 300 Kan. at 884. If the circumstances fall in the first category, the defendant is entitled to relief without showing actual prejudice. In the second instance, the defendant has to show that the conflict adversely affected his or her legal representation—a lower standard than the *Strickland* test for prejudice triggering a remedy. See *Fuller v. State*, 303 Kan. 478, 487, 363 P.3d 373 (2015). Here, as Sola-Morales concedes, the first two categories based on the multiple representation of clients in the same criminal matter do not apply.

Any possible conflict, then, must fit within the third category to warrant relief. The Kansas Supreme Court has referred to that sort of conflict of interest as the "*Mickens* reservation" because the United States Supreme Court has not expressly identified whether the defendant must show merely an adverse effect on his or her representation, as required under *Cuyler*, or must show sufficiently deficient representation to undermine confidence in the outcome of the criminal case, as required under *Strickland*. *Fuller*, 303 Kan. at 487; *Sola-Morales*, 300 Kan. at 884. The Kansas Supreme Court has yet to resolve the *Mickens* reservation by endorsing one or the other standard. See *State v. Moyer*, 309 Kan. 268, 279-80, 434 P.3d 829 (2019) (recognizing lack of governing standard); *State v. Lindsay*, No. 117,826, 2019 WL 2399477, at *7 (Kan. App. 2019) (unpublished opinion) (noting Kansas Supreme Court has treated standard as unresolved issue).

13

The Kansas Supreme Court most recently discussed the *Mickens* reservation in *Moyer* and identified three tests different courts have used to determine an "adverse effect" on representation requiring relief, assuming the *Cuyler* standard rather than the *Strickland* standard were to apply. 309 Kan. at 283-84. The most common test recognizes an adverse effect when the conflicted lawyer failed to undertake "some 'plausible alternative defense strategy or tactic that might have been pursued'" and made that choice because of the conflict. *United States v. Levy*, 25 F.3d 146, 157 (2d Cir. 1994); see *Perillo v. Johnson*, 79 F.3d 441, 449 (5th Cir. 1996); *Moyer*, 309 Kan. at 283. The second formulation adds a requirement that the alternative strategy or tactic be "objectively reasonable." *Moyer*, 309 Kan. at 283; see *United States v. Nicholson*, 611 F.3d 191, 197 (4th Cir. 2010). The third test, apparently unique to the Seventh Circuit, simply requires a showing of a reasonable likelihood the lawyer's representation would have been different had there been no conflict. *Moyer*, 309 Kan. at 283-84; see *Hall v. United States*, 371 F.3d 969, 974 (7th Cir. 2004).

The *Moyer* court acknowledged the three tests and, in particular, the discussion of them in *West v. People*, 341 P.3d 520 (Colo. 2015). But the court then recognized that Moyer would lose under each of three formulations of adverse effect and didn't identify one of them as the legally appropriate standard. *Moyer*, 309 Kan. at 284-85. So in *Mickens* reservation cases—where the defense lawyer had a conflict based on the past representation of another client or on some personal or financial interest—the Kansas Supreme Court appears to have left open whether the *Strickland* ineffectiveness standard or the *Cuyler* adverse effect standard applies and if *Cuyler* applies, the test for assessing adverse effect. We see *Moyer*'s ecumenical approach to the test for adverse effect as superseding *State v. Cheatham*, 296 Kan. 417, 452, 292 P.3d 318 (2013), in which the court identified and considered only the Seventh Circuit test.

For purposes of this appeal, we assume the adverse effect standard governs, since that is more favorable to Sola-Morales. Having made that assumption, we opt for a test of

14

adverse effect requiring the lawyer to have forgone a plausible defense strategy or tactic because of the conflict. In our view, the test necessarily includes some objective assessment of the unused strategy as plausible in preference to simply accepting an after-the-fact opinion from the lawyer that the strategy would have been wholly ineffective. At that point, the lawyer has been accused of having an active conflict of interest during the representation of the client, so his or her subjective assessment of various untried trial strategies seems sufficiently suspect that it should not be given especially great weight. A test without some objective measure tilts too heavily against the client. Conversely, we find the Seventh Circuit's test goes too far the other way by affording relief based simply on *some* difference in representation absent the conflict no matter how slight or ineffective. An "any difference" test would hand defendants a gratuitous remedy in some cases, as Sola-Morales' claim illustrates.

In many, if not most, of the *Mickens* reservations cases, the lawyer's conflict has arisen from the past representation of another client rather than from a personal or financial interest. But the origin of the conflict has no particular bearing on how the adverse effect of that conflict should be gauged. The adverse effect depends upon the substance of the lawyer's representation and any perceived deficiencies in that performance—not the conflict animating the performance. So our consideration of cases involving each kind of conflict does not diminish our determination of the best way of measuring adverse effect.

*2B. Record Fails to Support Active Conflict Based on Misrepresentations*

On appeal, Sola-Morales launches an array of arguments in an effort to show that Falk's handling of the criminal case involved an active conflict rooted in his legal obligations to other clients or his personal interests. The result is a brief that sweeps wide but falls short of advancing a point requiring relief.

15

First, Sola-Morales suggests Falk had an active conflict of interest because he misrepresented the grounds for the trial continuances, attributing them to the State's request rather than his own. And Falk ostensibly enhanced that conflict by falsely telling Sola-Morales that the district court denied his pro se motion to dismiss, when Falk actually withdrew it. Sola-Morales submits Falk lied about the disposition of the motion to cover up his lies about who requested the trial continuances. On appeal, the fundamental problem with that argument lies in the district court's factual finding that Falk did not make any such misrepresentations. Sola-Morales tries to avert that flaw by suggesting the district court's finding lacked substantial evidence in the record.

Substantial evidence is that which a reasonable person could accept as sufficient to support a factual proposition. See *State v. May*, 293 Kan. 858, 862, 269 P.3d 1260 (2012). In making that assessment of a district court's findings, we neither reweigh evidence nor make independent credibility determinations. K.S.A. 2018 Supp. 60-252(a)(5) ("Findings of fact must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witness' credibility."); *State v. Hartpence*, 30 Kan. App. 2d 486, 493, 42 P.3d 1197 (2002). A significant part of evaluating testimony rests on seeing the witnesses on the stand and observing how they respond to questions both on direct and cross-examination. *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008) ("[T]he ability to observe the declarant is an important factor in determining whether he or she is being truthful."); *State v. Franco*, 49 Kan. App. 2d 924, 936, 319 P.3d 551 (2014) ("'The judicial process treats an appearance on the witness stand, with the taking of an oath and the rigor of cross-examination, as perhaps the most discerning crucible for separating honesty and accuracy from mendacity and misstatement.'") (quoting *State v. Bellinger*, 47 Kan. App. 2d 776, 787, 278 P.3d 975 [2012] [Atcheson, J., dissenting]). Appellate courts have no comparable vantage point when they read a trial transcript, and that is precisely why they do not make credibility determinations. We will not do so here.

16

Although the district court's observations of Falk and Sola-Morales as each of them testified entails substantial evidence sufficient to support the factual finding that Falk did not lie about the continuances or the motion to dismiss, the record contains additional evidence. First, Sola-Morales appears to have relied on the letters from Falk's office in determining the State requested and received trial continuances. But that reliance would have been misplaced as to the first three letters, since none of them identifies who sought the continuance. To the extent Sola-Morales purported to rely on in-person meetings with Falk to advance his account—and his testimony isn't especially clear in that respect—it suffers from the same defect as Falk's testimony about their meetings. The jail records and other documents strongly suggest they could not have had a meeting around the time of each continuance, so Sola-Morales would have received no explanation (true or false) from Falk. The district court also concluded Falk had no particular motive or incentive to lie about requesting the trial continuances. Sola-Morales did not offer or establish a reason.

The district court's credibility determination rejecting Sola-Morales' version of his communications with Falk undercuts his argument for an active conflict and, in turn, a legal basis for habeas corpus relief. That is sufficient to affirm the district court's ruling on the point. We are comfortable in doing so. In his concurring opinion, Judge Leben explains why he is not. Accordingly, we next outline why Sola-Morales' claim fails even if Falk had lied about the trial continuances and the disposition of the motion to dismiss. We and Judge Leben agree on the outcome if Falk lied to Sola-Morales, although our analytical paths there differ.

*2C. Even if Falk Lied as Alleged, Sola-Morales Points to No Adverse Effect*

In his concurring opinion, Judge Leben contrasts the district court's bench ruling and initial journal entry with the final journal entry that parrots the State's proposed findings and conclusions and determines they are so discordant they cannot be reconciled. He would reject the final journal entry at least partly because the district court adopted the State's submission seemingly by rote and because the district court made no effort to explain the discrepancies between its earlier oral and written rulings and the last journal entry. Judge Leben focuses on the district court's initial assessment that Falk had a conflict of interest because he failed to communicate with Sola-Morales about the continuances and its characterization of that in the final journal entry as merely a potential conflict of no particular legal significance. He goes on to say that the testimony at the 60-1507 hearing supports Sola-Morales' position that Falk lied to him about who requested the trial continuances and the disposition of his motion to dismiss.

We share Judge Leben's general concern about district courts adopting one side's proposed findings and conclusions with little or no revision and his specific concern about the district court's decision to do so here. Although the practice may promote efficiency, especially for district courts with particularly crowded dockets, it does so at the expense of the appearance of fairness and in some cases with a loss of solid reasoning for an otherwise correct result.

That said, we do not see the stark conflict Judge Leben describes between the district court's initial findings in this case and the final journal entry. The district court recognized that Falk failed to communicate with Sola-Morales about the trial continuances. But a lack of communication about something is quite different from falsely communicating about it. Not communicating often enough with a client or failing to convey material information is poor practice and may be an ethical violation depending on the circumstances. See Kansas Rule of Professional Conduct (KRPC)

18

1.4(a) (2019 Kan. S. Ct. R. 299) (duty to keep client "reasonably informed"); Comment 2 ("[a]dequacy of communication" dependent on "kind of advice or assistance involved"). Lying to a client about a material matter is indisputably wrong and a clear ethical violation. See KRPC 2.1 (2019 Kan. S. Ct. R. 345) (duty to render "candid advice" to client); see *In re Morse*, 264 Kan. 286, 289-91, 954 P.2d 1092 (1998) (lawyer suspended from practice for failing to file bankruptcy case for client and falsely representing to client he had done so). So the district court's initial finding of a lack of communication between Falk and Sola-Morales doesn't contradict its later credibility determination that Falk didn't lie to Sola-Morales. If they didn't communicate, lies could not have passed between them. And if Falk didn't lie about the continuances, his purported motive to lie about the motion to dismiss also evaporates.

In short, the district court's initial finding that Falk did not communicate with Sola-Morales about the continuances can be reconciled with the later finding that Falk did not actively lie to Sola-Morales about the continuances. The failure to communicate may have been improper, but lying about the continuances would have been an obvious impropriety of markedly greater magnitude. We do not share Judge Leben's reasons for discounting the district court's credibility determination that Falk did not lie to Sola-Morales about the continuances or the disposition of his motion to dismiss. We, likewise, do not see the 60-1507 hearing evidence as leading to the conclusion Falk lied to Sola-Morales about the continuances or the motion.

But to extend Sola-Morales full consideration, especially in light of Judge Leben's concerns about the district court's findings, we alternatively analyze this claim assuming Falk lied about the continuances and the disposition of the motion to dismiss. In doing so, we underscore that we have simply assumed Falk engaged in the misconduct Sola-Morales has attributed to him.

19

Based on that assumption, however, Falk had an active conflict under the *Mickens* reservation rooted in his personal interest—avoiding the discovery and disclosure that he had lied about the continuances. And that conflict would have led him to torpedo the hearing on the motion to dismiss to avoid those lies coming to light. So Falk would have compounded the misrepresentations about the continuances by telling Sola-Morales the district court denied the motion on its merits, when he actually withdrew it.

Sola-Morales' 60-1507 claim still falters because he cannot show that the active conflict we have assumed on Falk's part resulted in an adverse effect on the legal representation. The test for an adverse effect requires the client to show the lawyer failed to pursue an objectively plausible alternative strategy or tactic because of the active conflict. Sola-Morales points to his motion to dismiss as the strategy or tactic that Falk abandoned. But the motion had no merit, so it could not have been a "plausible" strategy to secure a favorable result for Sola-Morales.

As we noted, Sola-Morales premised his pro se motion to dismiss on a purported statutory speedy trial violation and parenthetically mentioned his constitutional speedy trial right. On appeal, Sola-Morales has abandoned any substantive reliance on a violation of the speedy trial statute as an independent basis for relief because he had been detained both in this case and a separate criminal case. And the statutory right does not apply when a person is being held on more than one case. K.S.A. 2018 Supp. 22-3402(a); see *State v. Montes-Mata*, 292 Kan. 367, Syl. ¶ 2, 253 P.3d 354 (2011). Sola-Morales' position amounts to a tacit concession that the district court could not have granted the motion. Moreover, the motion would have failed because Falk did, in fact, request the continuances, and, as a result, the delays would not have counted against the speedy trial deadline regardless of what he told Sola-Morales. The motion never advanced an articulated argument for a constitutional speedy trial violation and would not have been successful on that score. We discuss in detail why Sola-Morales has no constitutional

20

speedy trial claim in Section 2E, since he has presented it as an independent basis for granting his 60-1507 motion.

Without belaboring the point, Sola-Morales' motion to dismiss was meritless. Filing or arguing a meritless motion cannot be a "plausible" strategy or tactic. So even if Falk withdrew the motion and falsely told Sola-Morales the district court denied it on the merits, Falk would not have forgone a plausible legal claim that could have improved the outcome of the case for Sola-Morales. While Falk would have had an active conflict under our assumed facts, Sola-Morales has failed to show the conflict resulted in any legal detriment, since the only difference would have been the presentation of a baseless motion to dismiss for the district court's consideration and inevitable rejection.

As we suggested earlier, those circumstances illustrate the weakness of the Seventh Circuit's test for an adverse effect requiring only a showing that the lawyer's representation would have been different absent the conflict—wholly divorced from any consideration of the efficacy of the difference. See *Cheatham*, 296 Kan. at 452 (quoting Seventh Circuit authority characterizing test for adverse effect as whether lawyer's "performance somehow would have been different"). Here, according to Sola-Morales, the difference would have been Falk's actually arguing (and undoubtedly losing) the frivolous motion for dismissal. So Sola-Morales would get a new trial because a worthless pretrial motion had not been presented to the district court—something that would have made no difference whatsoever in the trial, the jury's consideration of the evidence, or its verdict. A defendant in Sola-Morales' position would reap a substantial benefit without having suffered any legal prejudice. The any-difference-in-representation test, thus, affords a gratuitous remedy uncalibrated to the actual harm done.

That is not to say a lawyer representing a criminal defendant despite an active conflict of interest should escape any consequences. A lawyer in that position would be open to investigation and sanction for violating the rules of professional conduct. The

21

Kansas Supreme Court has taken precisely that approach in policing the trial conduct of prosecutors. If a prosecutor's improper comments or argument do not deprive a defendant of a fair trial, the defendant should not receive a new trial simply to punish the prosecutor. The remedy wouldn't be calibrated to the harm done the defendant. The prosecutor, however, may be held in contempt or sanctioned for professional misconduct—penalties geared to the misconduct. *State v. Sherman*, 305 Kan. 88, Syl. ¶¶ 7-8, 12, 378 P.3d 1060 (2016).

In closing up our discussion, we mention Judge Leben's resolution:  He comes to the same conclusion but gets there through a different legal route. Judge Leben has made a studied consideration of whether the *Strickland* substantial prejudice standard or the more relaxed *Cuyler* adverse effect standard should apply when a lawyer labors under a personal or financial conflict falling within the *Mickens* reservation. He has opted for the *Strickland* standard and concludes Sola-Morales cannot establish the degree of prejudice necessary for relief. On the first aspect of his analysis, Judge Leben may very well be right. We chose to bypass a deliberative choice between *Strickland* and *Cuyler* and have applied the adverse effect standard as a forensic device favoring Sola-Morales. If *Strickland* applies, Judge Leben has undoubtedly reached the correct conclusion on the second aspect of his analysis. Sola-Morales has not demonstrated actual prejudice calling the outcome of the criminal case into question.

*2D. Record Otherwise Shows No* Mickens *Reservation Conflict*

Sola-Morales alternatively contends Falk had an active conflict of interest in taking the trial continuances even if he were forthright about having requested them to accommodate his heavy caseload or his wife's illness. That is, Falk represented too many clients, and that alone created an impermissible conflict. The argument misperceives what amounts to a conflict under the *Mickens* reservation.

22

To labor under a covered conflict, a lawyer must consciously refrain from making a substantive argument or offering evidence favorable to the criminal defendant because of an actual or perceived duty to another present or former client. In other words, the conflict must adversely affect the quality of the legal work itself. As described in *McDaniel*, the lawyer's conduct must "'breach[] the duty of loyalty'" owed the criminal defendant. 306 Kan. at 611 (quoting *Strickland*, 466 U.S. at 692). The court, 306 Kan. at 611, specifically relied on Justice Marshall's separate opinion in *Cuyler*, which drew on the Canons of Professional Ethics, in outlining the sort of conflict that may be considered: "'[A] lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.'" *Cuyler*, 446 U.S. at 356 n.3 (Marshall, J., concurring in part and dissenting in part) (quoting Canon 6, Canons of Professional Ethics [1937]).

The discussion in *McDaniel* illustrates what is *not* considered an active conflict of interest triggering review under the *Mickens* reservation. There, McDaniel asserted his lawyer had a conflict of interest and divided loyalties because she had "prioritized her other clients' cases over his." 306 Kan. at 611. The court rejected the notion that the contention, even if true, stated a conflict of interest impairing the lawyer's ability to adequately represent McDaniel consistent with the constitutional right to counsel. 306 Kan. at 611.

In his alternative argument here, Sola-Morales relies on a purported conflict of interest because Falk represented numerous defendants in serious criminal cases and apparently elected to take at least one of those cases to trial before his case. But that is precisely the ersatz conflict the court rejected in *McDaniel*. A contrary rule of the sort Sola-Morales promotes would be illogical and unworkable: A lawyer handling more than one serious criminal case would inevitably have a conflict of interest, since he or she would have to advance one case to disposition before the other, thus "favoring" that

23

defendant. The false conflicts would increase exponentially the more criminal cases the lawyer simultaneously handled.

In short, Falk did not have an active conflict of interest in representing Sola-Morales because he also had agreed to handle a number of other serious criminal cases and that workload necessitated some or all of the six trial continuances. Sola-Morales makes a cognate argument that Falk requested at least a few of the continuances because of his wife's health and that amounts to a personal interest triggering the *Mickens* reservation. We disagree for the same reason. Any continuances attributable to Falk's wife's illness did not create an active conflict of interest that inhibited Falk in substantively defending Sola-Morales.

The trial continuances merely affected the relative timing of the defense—not its quality. By contrast, the *Mickens* reservation presumably would come into play if a lawyer's wife or child were being treated for cancer and the primary oncologist, simply by happenstance, was a key fact witness against a criminal defendant the lawyer represented. The lawyer would then face the prospect of cross-examining and trying to discredit a physician providing vital care to an immediate family member. Holding back in challenging a key witness would diminish the quality of the defense.

We mention in passing that a defense lawyer could not interminably continue a criminal case citing workload, especially if the client or the State were pressing for a trial or some other disposition. A lawyer must represent a client with due diligence. See KRPC 1.3 (2019 Kan. S. Ct. R. 298) ("A lawyer shall act with reasonable diligence and promptness in representing a client."); Comment 1 ("A lawyer's workload should be controlled so that each matter can be handled adequately."). The *McDaniel* court noted the material legal difference between an extended delay attributable to a lawyer's other work—a failing it characterized as "'deficient performance'"—and a conflict of interest

under *Mickens*, 306 Kan. at 611. They are neither the same nor fungible in establishing an active conflict of the sort described in the *Mickens* reservation.

On this point, we conclude that Sola-Morales has failed to establish Falk had a conflict of interest of the kind calling into question the constitutional adequacy of his legal representation. Falk's representation of numerous criminal defendants in a variety of cases does not in and of itself create an active conflict among those clients under the *Mickens* reservation. We think that alone requires affirming the district court's ruling rejecting that ground for habeas corpus relief.

*2E. No Conflict or Inadequate Representation Based on Constitutional Speedy Trial Claim or Failure to Call Duarte as a Trial Witness*

Sola-Morales has raised two subsidiary issues on appeal that in an abundance of caution and deference to him we address. First, he suggests Falk compromised his constitutional right to a speedy trial secured in the Sixth Amendment. Second, he suggests Falk's failure to call Duarte as a trial witness amounted to constitutionally inadequate representation under either the adverse-effect test described in *Mickens* or the more demanding prejudice test in *Strickland*. Neither suggestion has merit. They also arguably exceed the scope of the remand to address Falk's purported conflict of interest.

As we have already explained, Sola-Morales' motion to dismiss based on a statutory speedy trial violation had no merit. On appeal, Sola-Morales has attempted to meld his argument for Falk having an active conflict of interest with a claim that the trial continuances somehow impaired his constitutional right to a speedy trial. The effort fails. As we have said, Falk did not have a conflict. Even if Falk did, Sola-Morales cannot show he was deprived of his constitutional right to a speedy trial. So arguing a constitutional violation would not have been a plausible strategy or tactic under the *Cuyler* standard. Nor would it have called into doubt or undermined the outcome of the case under the *Strickland* standard.

25

Sola-Morales asserts that Falk, by requesting and receiving the trial continuances, violated his constitutional speedy trial right. But the right is ultimately a protection against government action or, more precisely, inaction in failing to bring a defendant to trial within a reasonable time. *Barker v. Wingo*, 407 U.S. 514, 527, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972) ("duty" of State to bring criminal defendant to trial); *Smith v. Hooey*, 393 U.S. 374, 383, 89 S. Ct. 575, 21 L. Ed. 2d 607 (1969).

In *Barker*, the Court fashioned a four-part test to examine whether the government has denied a defendant a speedy trial as guaranteed by the Sixth Amendment: (1) the length of delay; (2) the reasons for the delay; (3) the defendant's assertion of the constitutional right; and (4) the prejudice to the defendant arising from the delay. 407 U.S. at 530; see *State v. Weaver*, 276 Kan. 504, 506, 78 P.3d 397 (2003) (applying *Barker* to Sixth Amendment speedy trial challenge). The Court recognized the factors are interlocking and other circumstances in a given case may also be relevant to a claimed constitutional deprivation. *Barker*, 407 U.S. at 530-31. As discussed in *Barker* and since applied elsewhere, the length of delay operates, in part, as a gatekeeper to the remaining factors. That is, a defendant, in light of the circumstances of his or her case, must show that the properly measured delay may be considered likely or presumptively prejudicial. *Barker*, 407 U.S. at 530-31; *State v. Waldrup*, 46 Kan. App. 2d 656, 679, 263 P.3d 867 (2011). Here, the time is measured from Sola-Morales' arrest to his trial—just about a year. *State v. Robinson*, 56 Kan. App. 2d 567, 573, 434 P.3d 232 (2018). We assume without deciding the delay may be considered presumptively prejudicial. By the same token, however, bringing a homicide case to trial in a year could not be characterized as extraordinarily slow. See Annual Report of the Courts of Kansas for Fiscal Year 2018, Office of Judicial Administration, at 62 (12.1 percent of *all* felony cases in Sedgwick County pending for more than 12 months, including those resolved by plea or dismissal). So the delay itself isn't a particularly strong ground for a speedy trial violation.

As a general matter, the delay resulting from a court-ordered continuance should be attributed to the party requesting the additional time. *Weaver*, 276 Kan. at 508 (time attributable to defense continuances given limited significance in constitutional speedy trial determination); *United States v. Erenas-Luna*, 560 F.3d 772, 778 (8th Cir. 2009) (same). Here, Sola-Morales contends nine months of the delay resulted directly from the continuances Falk requested. That appears to be undisputed. In considering a constitutional speedy trial claim, those continuances should not be counted against the government. See *Vermont v. Brillon*, 556 U.S. 81, 90-91, 129 S. Ct. 1283, 173 L. Ed. 2d 231 (2009) ("delay caused by the defendant's counsel is . . . charged against the defendant"); *United States v. Gould*, 672 F.3d 930, 937 (10th Cir. 2012). This is not a case in which a defendant may have been forced to request a trial delay because of the State's dilatory production of discovery or the like—a circumstance favoring attribution of the time to the government. Between July 2005 and the trial in March 2006, the State requested no continuances. Those circumstances weigh against any constitutional speedy trial violation.

The third factor looks at the defendant's assertion of his or her speedy trial right. Here, Sola-Morales raised speedy trial issues for the first time in his pro se motion to dismiss filed about a month before the trial. The claim came late in the process. And it took the form of a motion to dismiss based on what Sola-Morales inferred were continuances the State had already received. So Sola-Morales had not otherwise affirmatively requested a speedy trial. The absence of an earlier request cuts against a violation.

As to the final factor, the *Barker* Court identified three types of potential prejudice a criminal defendant faces when a trial is unduly delayed:  oppressive pretrial incarceration; anxiety and concern sparked by the unresolved proceedings; and possible impairment of a defense. *Barker*, 407 U.S. at 532; see also *Rivera*, 277 Kan. at 118. Potential harm to the defense typically reflects "the most serious" consequence of delay

27

"because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532. As the *Barker* Court pointed out, an especially long delay may also degrade the truth-seeking function of a trial because some witnesses may be lost altogether and the memories of those who testify may well be dulled by the passage of time. 407 U.S. at 521. That sort of implicit erosion of the trial process affects both the prosecution and the defense and may be considered in assessing prejudice, although it should not be treated as determinative. *Doggett v. United States*, 505 U.S. 647, 655-56, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992).

Sola-Morales doesn't identify with specificity any prejudice resulting from the delay but cites cases noting the anxiety and other emotional strain that often accompany pretrial detention. Here, though, Sola-Morales was being detained on another case, as well, so any upset could not be attributed solely and, thus, directly to the continuances in this case. Likewise, Sola-Morales does not lay out any particular prejudice to his defense in conjunction with his speedy trial right. He has separately argued the failure to call Duarte as a witness undercut his trial, a claim we turn to next and reject. We see nothing about the evidence in this case to suggest that the overall reliability of the truth-seeking process was materially compromised because of the continuances. The bulk of the State's case rested on crime-scene and forensic evidence and the descriptions of the shooting Sola-Morales gave his coworker and law enforcement officers shortly after it occurred. Evidence of that sort would not tend to erode with the passage of time, especially when the officers contemporaneously documented their interactions with Sola-Morales. Moreover, the lapse of time between the material events and the trial wasn't especially great.

In sum, Sola-Morales hasn't shown his constitutional right to a speedy trial was compromised, so his argument for habeas corpus relief premised on that contention necessarily fails.

For his second point, Sola-Morales argues that because of the continuances Duarte was unable to testify at the trial and her testimony would have made a material difference. The undisputed evidence from the hearing on the 60-1507 motion shows Duarte was in the middle of an extended visit to Cuba in March 2006 when the case went to trial. Duarte testified at the hearing that she had informed Falk about the trip well before the trial, a proposition we nominally accept as true.

During the hearing, Duarte said she would have given testimony at the trial consistent with a written statement she had prepared in November 2006. The statement was admitted as an exhibit and is part of the appellate record.

In the statement, Duarte describes Sola-Morales coming home from work in the early evening and then going to Sibat's residence. As the evening wore on and Sola-Morales didn't return, Duarte states she unsuccessfully tried to call him several times and even drove by Sibat's home, where she saw the two men standing outside. She did not approach them and returned to her home. Duarte wrote that she called Sola-Morales about 2:30 a.m. and he told her that he and Sibat were drinking and everything was okay. According to the statement, about 30 minutes later, Sola-Morales returned home "drenched in blood" and "very scared." So Duarte asked what happened. She wrote:

Sola-Morales explained that he and Sibat started arguing, and he tried to leave. Sibat told Sola-Morales he wasn't leaving, so they "started to fight." Sibat then drew a gun. Sola-Morales "took it [the gun] from him and somehow the bullet came out of the gun." Sola-Morales said unidentified friends urged him to leave town because the police here were "worse than the police in Cuba." Duarte told him he should stay. But he left anyway.

In the statement, Duarte briefly described her communications with Falk before the trial. She wrote that she had told Falk she would be in Cuba in March 2006. And she

wrote that before the trial Falk repeatedly said Sola-Morales should accept the State's plea offer. At the 60-1507 hearing, Falk testified that the State had offered to reduce the second-degree murder charge to voluntary manslaughter with a recommendation for a downward durational departure on the prison sentence in exchange for Sola-Morales' plea. The record does not include more precise details of the offer, and Sola-Morales premises none of his 60-1507 claims on anything related to the offer or its rejection.

Had Duarte been called as a defense witness at trial, we question whether she could have testified to what Sola-Morales told her after he returned from Sibat's home. Since Sola-Morales exercised his right not to testify, he was unavailable as a witness. See K.S.A. 60-459(g)(1) (person unavailable if "exempted" by privilege from testifying). The State could not have compelled Sola-Morales to testify consistent with his privileges against self-incrimination in both the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. In turn, what Sola-Morales told Duarte would have been inadmissible hearsay under K.S.A. 2018 Supp. 60-460. Presumably Sola-Morales' account of the homicide would have been the focal point of Duarte's testimony. She otherwise could have described her efforts to communicate with him before the shooting and his physical appearance afterward. None of that would have had much significance in the jury trial.

Even assuming Duarte could have testified at trial to what she says Sola-Morales told her about the shooting, we fail to see how that evidence would have made any appreciable difference. Sola-Morales recounted three versions of Sibat's death to law enforcement officers, and the prosecutors had the lead detective outline all of them for the jury. The account Duarte wrote down more or less fits with the second version Sola-Morales gave the police—he and Sibat were wrestling over the handgun when it fired. But that account comes with at least two distinct drawbacks. First, of course, Sola-Morales superseded it himself with another narrative for police describing something like an intentional act of self-defense. Second, the forensic evidence, most notably the

30

absence of gunpowder residue and stippling, didn't support a scenario in which Sibat somehow got shot during hand-to-hand combat with Sola-Morales.

So Sola-Morales can't make any headway with this argument, since Duarte's missing testimony wouldn't have tipped the trial in any measurable way toward a better outcome for him. The claim, therefore, fails under the prejudice component of the *Strickland* test. The *Mickens* reservation does not apply because Duarte's absence as a trial witness could not be attributed to the active conflict Sola-Morales has alleged. The purported conflict arose from Falk's lies about who requested the continuances—not from the continuances themselves.

*Conclusion*

We have carefully examined Sola-Morales' arguments and find no error in the district court's conclusion to deny his habeas corpus motion on the grounds the Kansas Supreme Court remanded for hearing. Sola-Morales failed to present a hearing record supporting relief based on the failure to call Peterson as a trial witness, and he hasn't argued otherwise in this appeal. The district court's credibility determinations undercut any claim that Falk made material misrepresentations to Sola-Morales about the trial continuances or the motion to dismiss resulting in a conflict of interest. Even assuming Falk misrepresented those circumstances, Sola-Morales has not shown he was deprived of a plausible strategy or tactic as a result. The evidence otherwise fails to show a conflict coming within the *Mickens* reservation. Sola-Morales' related arguments premised on a constitutional speedy trial violation and the failure to call Duarte as a trial witness also fail. There was no constitutional violation. And Duarte's key testimony would have been either inadmissible or, if admitted, unpersuasive.

Affirmed.

* * *

LEBEN, J., concurring: This appeal involves the claim of Santiago Sola-Morales that he was convicted of voluntary manslaughter because his attorney provided inadequate representation in two respects: (1) that the attorney, Roger Falk, should have called Stephen Peterson to testify at trial; and (2) that Falk had a conflict of interest while he was representing Sola-Morales.

On the first claim, the district court found that Falk made a legitimate strategic decision not to call Peterson as a witness, and that conclusion is supported by the evidence presented to the district court. No further discussion of that claim is needed.

The second claim presents a situation so unusual I've not encountered it before in 26 years as a judge and 37 years as a lawyer. The trial judge held an evidentiary hearing to decide two important questions: (1) did the attorney who represented Sola-Morales have a conflict of interest and (2) if so, should Sola-Morales get a new trial? The judge found that there was a conflict but that it didn't require granting a new trial. Substantial evidence supported the finding of a conflict.

Then when Sola-Morales asked the judge to reconsider his ruling on that second question, the court—without explanation—suddenly reversed the finding it had made that a conflict had existed. The court did so by adopting verbatim the proposed findings the prosecutor submitted saying that no conflict existed. But the prosecutor's proposed finding that there was no conflict had been submitted to—and rejected by—the court when it initially found that a conflict had existed.

The court's original finding of a conflict came in an oral ruling from the bench a few months after hearing the parties' evidence. The court then confirmed in a written

32

order, filed four months later, that a conflict had existed. Then—one year after it had heard the evidence—the court reversed course and said that there had been no conflict.

Reversing key rulings without explanation a year after hearing evidence by adopting a party's once rejected findings verbatim is not how a justice system works. In this situation, in my view, the trial court abused the judicial power entrusted to it. I would uphold the original finding—made orally, confirmed in writing, and supported by the evidence—that a conflict existed.

But that doesn't end the analysis. We still must decide which of two standards applies to determine whether Sola-Morales gets a new trial. Under one standard, he must only show that the conflict affected the representation provided by his attorney. Under the other standard, he must also show that the inadequate representation caused by the conflict prejudiced him, meaning that there's a reasonable probability that the result would have been different had the conflict not interfered with the representation. Because the United States Supreme Court has only applied the lesser standard in limited situations in which it would be hard to determine whether prejudice occurred—and this is a case in which we can determine whether Sola-Morales was prejudiced—I would hold that the normal prejudice standard applies. As the majority has explained, Sola-Morales cannot show prejudice. I therefore agree with its conclusion that Sola-Morales isn't entitled to a new trial.

I. *Falk Had a Conflict of Interest.*

The district court held an evidentiary hearing to answer two questions. First, did Falk have a conflict of interest? Second, if he did, should Sola-Morales get a new trial?

Let's start with the first question: did a conflict of interest exist? See *Sola-Morales v. State*, 300 Kan. 875, 899-900, 335 P.3d 1162 (2014). A conflict of interest exists when

33

defense counsel actively represents competing interests. 300 Kan. at 883. An attorney actively represents competing interests when, "'during the course of representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action.'" *State v. Cheatham*, 296 Kan. 417, 453, 292 P.3d 318 (2013).

Sola-Morales argues that Falk had a personal interest in avoiding disciplinary action for his conduct that conflicted with Sola-Morales' interest in defending his motion to dismiss. As an overview of that conflict, Sola-Morales knew that his trial had been continued several times, and he said Falk had told him that the State had obtained the continuances. In fact, Falk had taken the continuances—without Sola-Morales' presence in court. After Falk had gotten several continuances, Sola-Morales acted without his attorney's help and filed his own motion to dismiss on speedy-trial grounds, claiming that the State had obtained all these continuances.

When that motion was set for hearing, Sola-Morales was brought to the courthouse. But he never made it into the courtroom; Falk told the court that Sola-Morales was withdrawing that motion. Falk said Sola-Morales had authorized its withdrawal; Sola-Morales said he didn't. Sola-Morales contends that Falk withdrew the motion to protect his own interest in not having the court find out that Falk had falsely told Sola-Morales that the earlier extensions had been sought by the State. Sola-Morales argued that was a conflict of interest between Falk and his client.

At first, the district court found that Falk had a conflict. At the evidentiary hearing, the court heard testimony from Sola-Morales, Falk, and Sola-Morales' ex-wife, Jackie Duarte. The parties then submitted briefs with proposed findings on whether the testimony established that Falk had a conflict of interest. On the same day the court heard oral argument on those briefs in January 2016, it announced its oral findings. The court found that a conflict of interest had existed:

34

- "Was there a conflict created resulting from the lack of communication on continuances between Mr. Falk and Mr. Sola-Morales? It does appear to me that in fact there was a conflict created."
- "I would note for the record that I am at this time merely stating that, yes, a conflict existed due to the lack of regular communication."
- "You're asking as to whether or not [the lack of access to court the day of the hearing] was part of the conflict that existed, and did it affect his inability to personally stand before the court . . . and be heard. That is a natural outcome of the findings that I have made here, yes."
- "The conflict was, just originally, was there a conflict that existed as between Mr. Sola-Morales and Mr. Falk as to their ability to communicate, and Mr. Sola-Morales' ability to assert his objection as to continuances personally, rather than through counsel."

In short, the district court in January 2016 found that Falk had a conflict of interest based on his lack of communication and Sola-Morales' inability to personally object to the continuances.

The court then confirmed its findings in writing. In a May 2016 journal entry, the court summarized its oral findings on the conflict issue: "Falk created a conflict by failing to regularly communicate with [Sola-Morales] and depriving [him] of the ability to assert his objections to continuances." So by May 2016, the district court had twice found that a conflict existed—once in its January oral findings and again in writing in May.

That finding was supported by substantial evidence establishing that Falk had a personal interest in preventing Sola-Morales from appearing at the hearing on his motion. Sola-Morales and Duarte both testified that Falk said the State had requested the continuances. In fact, of course, Falk had requested them. Sola-Morales testified that at in-person meetings at the jail, Falk said the State was responsible for delaying the trial.

35

Duarte also testified that Falk told her the State was taking the continuances. (She had been talking to Falk at Sola-Morales' request because Falk had not met with Sola-Morales in person for several months.)

Falk denied having lied to Sola-Morales and said that shortly after requesting a sixth continuance he told Sola-Morales in person that he had taken the continuances, not the State. Yet only a few weeks later Sola-Morales filed his own motion to dismiss the charges on speedy-trial grounds—and in that motion he stated his continued belief that the State had taken the continuances. From the fact that Sola-Morales filed his motion even after Falk said he had discussed the continuances with Falk, the district court could reasonably have concluded that Falk's testimony on this point wasn't accurate: It's unlikely that Sola-Morales would have filed a motion erroneously claiming that the State was taking continuances if he had recently been told by Falk that Falk, not the State, had been taking them. Sola-Morales might have filed some claim against his attorney or some request for new counsel, but not a motion to dismiss premised on the claim that the State had caused all the trial delays to date.

The facts as Sola-Morales and Duarte described them supplied a reason for Falk to be personally interested in Sola-Morales not appearing in the courtroom during the hearing on his motion—preventing discovery by the court of what he'd done. Lying to a client is a serious breach of the duty of loyalty owed by every attorney to a client, so Falk could be subject to disciplinary action if Sola-Morales told the court why he had mistakenly thought the State was requesting continuances. So while Falk's duties to Sola-Morales required him to pursue vigorously his client's interests, which included supporting Sola-Morales' right to appear personally at the hearing, doing so meant subjecting himself to potential disciplinary action when the court discovered his conduct.

36

That view of the evidence is the only one reasonably consistent with the trial court's original oral ruling that Falk had a conflict of interest. And that finding was supported by substantial evidence—and then confirmed in a written ruling.

So the court had twice found a conflict but still had granted no relief to Sola-Morales, who was seeking a new trial. That prompted Sola-Morales to ask the court to reconsider whether a new trial should be ordered. Sola-Morales did ask the court to clarify that when it found a "conflict," it meant a "conflict of interest" and that this required ordering a new trial. But at no point did Sola-Morales (or the State, for that matter) ask the court to reconsider its original finding that a conflict between attorney and client had existed in the first place.

In response to Sola-Morales' reconsideration motion, the State submitted proposed factual findings. The findings in the State's response to the motion to reconsider were substantively the same as those in its brief filed before the district court's oral findings; the State didn't propose any new findings in the motion that it had not already proposed in its earlier brief. In particular, the State's response repeated the claim from its brief that no conflict of interest existed. So even though Sola-Morales had not asked the court to reconsider its finding that a conflict had existed, the State's proposed findings submitted in response still included a proposed finding that no conflict had existed.

In May 2017, the district court ruled on Sola-Morales' motion to reconsider. It simply adopted the State's proposed findings verbatim, including the finding that no conflict of interest had existed. Having found the existence of a conflict twice already, most recently in May 2016, the court in May 2017 now said the opposite.

Three things stand out about the district court's unexpected reversal. First, the findings that the court adopted verbatim in May 2017 were the same ones it had rejected conclusively in January 2016. Before the court announced its findings from the bench,

the State had submitted a brief with its proposed findings. That brief contained each of the proposed findings that the court would later copy and paste into its May 2017 order, including a proposed finding that no conflict of interest had existed. And we know that the district court read the State's brief because it said so in first sentence of its oral findings: "I have given consideration to both [issues], after reviewing . . . the written memorandums provided to the Court for . . . oral arguments." Then it rejected the State's argument, finding instead that a conflict existed. So the court considered and rejected the findings it would later adopt word-for-word.

Second, the district court didn't acknowledge or attempt to explain the contradiction. We've said in other contexts that a trial court is "bound by fundamental principles of logic and has a duty to explain its decisions." *State v. Meyer*, 17 Kan. App. 2d 59, 70, 832 P.2d 357 (1992). In criminal and civil bench trials, for example, a court can't make inconsistent and irreconcilable findings. See 17 Kan. App. 2d at 70 (criminal); *McDonnell v. The Music Stand, Inc.*, 20 Kan. App. 2d 287, 290, 886 P.2d 895 (1994) (civil). Although the district court is free to depart from its earlier findings, it must at least provide a logical explanation for doing so. Here, the district court didn't acknowledge or explain its flip-flop; it simply stated the new findings as if they had been the only ones issued.

The court's treatment of Falk's testimony highlights this point. Sola-Morales claimed that a conflict existed because he was "unable to object, in court to a judge, about the numerous, unauthorized continuances in his case." As Sola-Morales' attorney put it in oral argument to the district court:

"Mr. Sola-Morales was prevented from being able to approach the court and express his strenuous objection to any further continuances.

". . . The only time he tries to express his voice about not having a trial and having it move forward is his motion to dismiss the case because the State has taken all

38

of the continuances up to this point. And with that being withdrawn, and not having an opportunity to talk to the court, the conflict exists . . . because . . . we believe the evidence shows Mr. Falk withdrew that motion without the concurrence of Mr. Sola-Morales."

The court implicitly accepted Sola-Morales' testimony, finding a conflict based on Sola-Morales' "ability to assert his objection as to continuances personally, rather than through counsel." His attorney had argued that the only opportunity Sola-Morales had to object personally to the continuances was the hearing on his motion. On that issue, Falk had testified that Sola-Morales gave him permission to withdraw the motion; Sola-Morales testified that he didn't give Falk permission to do so. The court could not have found a conflict based on Sola-Morales' ability to personally object to continuances unless it found his testimony more credible than Falk's.

Yet the court's 2017 ruling said that Sola-Morales had not shown either that "Falk's lies about the continuances generally prevented him from participating in his own defense" or that "Falk withdrew the motion to dismiss to cover his tracks, or that [Sola-Morales] was prevented from participating in his own defense." It now found that "Falk's testimony regarding the continuances  [was] more credible than the evidence presented by [Sola-Morales]." The court didn't explain why Falk's testimony had suddenly become more credible or Sola-Morales' testimony less so.

Third, the district court made this total reversal by simply adopting the State's findings verbatim. Kansas courts have long said that a court should adopt a party's findings only if they are "*in accordance with* the decision of the court as announced." (Emphasis added.) *English v. English*, 53 Kan. 173, Syl. ¶ 3, 35 P. 1107 (1894). The Kansas Supreme Court discourages the practice because it is susceptible to abuse. *Stone v. City of Kiowa*, 263 Kan. 502, 506, 950 P.2d 1305 (1997). Still, we usually find no abuse of discretion in cases involving verbatim adoption of a party's findings because the

39

findings merely restate what the court has already said itself. E.g., *Huffman v. City of Maize*, 54 Kan. App. 2d 693, 703, 404 P.3d 345 (2017). In those cases, we admonish the court for not making its own findings but ultimately affirm the decision because adopting one party's findings is not by itself an abuse of discretion. 54 Kan. App. 2d at 703-04.

Here, though, the district court's verbatim adoption of the State's findings is unlike any other case involving this practice. The court didn't adopt a restatement of its own findings; it adopted a *reversal* of its announced findings. The court independently found a conflict, then it adopted the State's proposal that found no conflict. It's one thing to announce "there's a conflict" and then adopt one party's findings that also say "there's a conflict"; it's another to announce "there's a conflict" and then adopt one party's findings that say "there's *not* a conflict."

To review, the district court twice found that a conflict of interest existed. The State responded to Sola-Morales' request that the court reconsider a different finding by repeating its claim that no conflict had existed—a position the district court had rejected in its earlier findings. Even so, the court then adopted verbatim the State's proposed findings, including the finding that no conflict of interest had existed, without acknowledging that it had reversed course.

Under these circumstances, I would uphold the district court's original finding that Falk had a conflict of interest. Our court always has jurisdiction to "to correct, modify, vacate or reverse any act, order or judgment of a district court to assure that any such act, order or judgment is just, legal and free of abuse." K.S.A. 60-2101(a). Although trial courts have broad discretion when making factual findings, that discretion is limited by basic principles of justice. The court here violated those principles when it reversed its earlier findings without explanation by adopting the State's findings verbatim. That's not how a justice system works. I would modify the district court's May 2017 order by reinstating its earlier finding that Falk had a conflict of interest.

40

The majority instead affirms the district court's May 2017 finding—that Falk didn't have a conflict—because that finding was supported by substantial evidence too. They're right, of course, that the district court *could* have found that the evidence supported a no-conflict finding. To do so, the court would have found Falk's testimony on the key points more credible than Sola-Morales' testimony. But the court had done the opposite in its initial oral ruling and its first written one.

So while we must defer to the district court's evaluation of witness credibility, that principle doesn't authorize the sort of trial-court flip-flop found here. The court's original finding of a conflict after personally observing the witnesses had to rest on a conclusion that Sola-Morales' testimony was more credible than Falk's. Given the unique procedural posture of this case, I would defer to the court's original finding, which it made closer in time to the hearing, while the testimony was still fresh in its mind, and without using the discouraged practice of adopting a party's proposed findings verbatim.

Affirming the court's May 2017 finding as supported by substantial evidence would make sense if that had been the only finding the court had made. But it wasn't. When the court adopted the State's findings verbatim, it had already found that a conflict existed and rejected the State's evidence to the contrary. That original finding was supported by substantial evidence, and no one asked the court to reconsider that aspect of its earlier ruling. I therefore do not credit the court's May 2017 finding on this point. See K.S.A. 60-2101(a).

II. *Falk's Conflict of Interest Adversely Affected the Representation but Did Not Prejudice Sola-Morales, So a New Trial Is Not Required.*

Having determined that a conflict of interest existed, we proceed to the second question: should Sola-Morales get a new trial? To answer that question, we first must decide what standard applies to Sola-Morales' ineffective-assistance claim.

Sola-Morales' claim is based on Falk's personal conflict of interest. This type of ineffective-assistance claim fits under what the Kansas Supreme Court has called the "*Mickens* reservation." *Sola-Morales*, 300 Kan. at 884. *Mickens* reservation cases involve conflicts based on defense counsel's obligations to former clients or based on counsel's personal or financial interests. See *Mickens v. Taylor*, 535 U.S. 162, 174, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002). When the conflict is with some personal interest of defense counsel, as is the case here, the United States Supreme Court has not said what test applies to determine whether the defendant should receive a new trial. *Sola-Morales*, 300 Kan. at 884. So we must decide.

In making that decision, we have two options: the standard from *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is applied by the United States Supreme Court to most claims of inadequate representation, or the lower standard the Court applied in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980).

The *Strickland* standard applies to deficient-performance claims generally and requires the defendant to show prejudice, meaning a reasonable probability that the result would have been different but for counsel's performance. 466 U.S. at 687-88. The *Cuyler* standard applies when an attorney represents multiple codefendants concurrently. 446 U.S. at 348. In that situation, the Court has noted "the high probability of prejudice

arising from multiple concurrent representation, and the difficulty of proving that prejudice." *Mickens*, 535 U.S. at 175.

Because of that, *Cuyler* requires only that the defendant show that a conflict adversely affected the lawyer's performance. 446 U.S. at 348. If it did, then reversal is automatic—even if prejudice cannot be shown—because the conflict renders the decision unreliable. *Mickens*, 535 U.S. at 172-73. A conflict adversely affects performance when the conflicted attorney, facing divided loyalties, "proceed[s] to act against the defendant's interests." 3 LaFave, Israel, King & Kerr, Criminal Procedure § 11.9(d) (4th ed. 2018). But the defendant cannot show an adverse effect if the lawyer "actually pursued the route favoring his client, disregarding the conflict of interest." 3 LaFave, Israel, King & Kerr, Criminal Procedure § 11.9(d) (4th ed. 2018). In short, the defendant must show prejudice to the proceeding outcome if *Strickland* applies but only an adverse effect on representation if *Cuyler* applies.

Here, though, we don't have multiple concurrent representations; we have an attorney whose conflict was between the attorney's personal interests and proper representation of the client. With no United States Supreme Court decision from that context, we turn to the Kansas Supreme Court for guidance. In each *Mickens* reservation case it has considered, the Kansas Supreme Court has applied *Cuyler*, but it has done so under circumstances in which it didn't need to decide which test should be applied when there's a conflict between the defendant and the defense attorney's personal interests.

In *State v. Galaviz*, 296 Kan. 168, 291 P.3d 62 (2012), the court noted that it wasn't clear after *Mickens* whether *Strickland* or *Cuyler* applies to personal-conflict claims. Although *Galaviz* involved an attorney's successive representation of clients (not a personal-interest conflict), the court noted that *Mickens* left open what test applies to personal conflicts. *Galaviz*, 296 Kan. at 184. The court applied *Cuyler*'s adverse-effect test to the successive-representation claim without deciding whether that test was

43

appropriate in *Mickens* reservation cases. *Galaviz*, 296 Kan. at 192. It did so because the State hadn't argued that any other test should apply and because the defendant benefited from the application of *Cuyler*'s more lenient standard. *Galaviz*, 296 Kan. at 192. The court applied *Cuyler*, then, to a successive-representation conflict because doing so benefited the defendant and because the State hadn't argued for a different test.

In *Cheatham*, 296 Kan. at 447-48, the court considered a defense attorney's financial conflict of interest. The defendant had entered into a flat-fee agreement with his attorney. He argued that the agreement created a financial conflict by discouraging his attorney from prioritizing his case. Because *Mickens* also left open the test applicable in financial-conflicts claims, the court had to determine whether *Strickland* or *Cuyler* applied. *Cheatham*, 296 Kan. at 448. The State argued that *Cuyler*—the easier test for the defendant to meet—should apply, so the court applied *Cuyler*'s adverse-effects test. *Cheatham*, 296 Kan. at 450.

So our Supreme Court applied *Cuyler*'s adverse-effects test in both *Galaviz* and *Cheatham*, but it didn't decide whether it had to do so. That may explain why the Kansas Supreme Court invited the district court here to "determine which test is applicable in this *Mickens* reservation analysis"—*Strickland* or *Cuyler*. *Sola-Morales*, 300 Kan. at 899.

The district court declined this invitation, however, concluding that Sola-Morales couldn't prevail under either test. The State's brief takes a similar approach, arguing that Sola-Morales cannot prevail under either standard but offering no reason why we should apply one or the other. Sola-Morales' brief argues that *Cuyler* should apply. He contends that many federal courts apply *Cuyler* rather than *Strickland* to personal conflicts like Falk's.

Sola-Morales is right that many federal appellate courts have applied *Cuyler* in cases involving personal conflicts of interest. Our Supreme Court cited several of those

44

decisions in its 2014 opinion. *Sola-Morales*, 300 Kan. at 896-97 (citing *Stoia v. United States*, 22 F.3d 766, 771 [7th Cir. 1994]; *Solina v. United States*, 709 F.2d 160 [2d Cir. 1983]). But most of the federal cases predated *Mickens*, which questioned whether courts should extend *Cuyler* to personal conflicts of interest.

*Cuyler* involved a conflict arising from defense counsel's concurrent representation of codefendants. 446 U.S. at 337. In *Mickens*, a case involving successive representation, the Court applied *Cuyler*'s standard because the case "was presented and argued on the assumption that . . . [it] would be applicable." *Mickens*, 535 U.S. at 174. The Court emphasized, though, that *Cuyler* is an exception to *Strickland*'s prejudice standard. *Mickens*, 535 U.S. at 175. The Court said that lower courts had applied *Cuyler* to all sorts of conflicts—like an attorney's financial interest in a book deal, an attorney's interest in teaching, and an attorney's fear of antagonizing a trial judge. 535 U.S. at 174-75. But the Court said that *Cuyler* "does not clearly establish, or indeed even support, such expansive application." While a concurrent representation has a high probability of prejudice that's difficult to prove, the Court said that "[n]ot all attorney conflicts present comparable difficulties." 535 U.S. at 175.

Despite that cautionary note, many—perhaps most—federal courts continue to apply *Cuyler* to personal-conflicts claims. E.g., *Rubin v. Gee*, 292 F.3d 396, 402 n.2 (4th Cir. 2002) (finding that a state court correctly applied *Cuyler* to a claim based on defense counsel's personal and financial conflict of interest); *Rugiero v. United States*, 330 F. Supp. 2d 900, 906 (E.D. Mich. 2004) (applying adverse effects to a personal conflict, citing the Sixth Circuit's universal application of *Cuyler* to all types of conflicts); 3 LaFave, Israel, King & Kerr, Criminal Procedure § 11.9(d) n.184 (4th ed. 2018) ("Although recognizing that the issue is open, . . . federal courts have continued to apply the automatic reversal rule."). In addition, many state courts have applied the adverse-effects test beyond situations involving concurrent representation of codefendants. E.g., *People v. Miera*, 183 P.3d 672, 676-77 (Colo. App. 2008); *Alessi v. State*, 969 So. 2d

45

430, 436 (Fla. Dist. Ct. App. 2007) (collecting Florida Supreme Court cases and applying *Cuyler* to a personal and financial conflict); *Taylor v. State*, 428 Md. 386, 410 n.13, 416, 51 A.3d 655 (2012) ("We join those states continuing to apply [*Cuyler*] to various types of conflicts."). But see *Echols v. State*, 354 Ark. 530, 127 S.W.3d 486 (2003) (applying *Strickland* standard except for multiple-representation conflicts).

Sometimes courts may apply *Cuyler*, as the Kansas Supreme Court did in *Galaviz* and *Cheatham* based on the arguments the parties have made and because the result is the same under both *Cuyler* and *Strickland*. Here, though, the difference in the standard to be applied here is determinative; Sola-Morales can't show that his trial's outcome would have been different without Falk's conflict of interest—his speedy-trial claims are weak, so the trial would have proceeded just the same even if the speedy-trial motion had been heard.

The majority has discussed the weakness of the speedy-trial claims. Sola-Morales had no statutory speedy-trial claim because he was being held in more than one criminal case. See *State v. Montes-Mata*, 292 Kan. 367, Syl. ¶ 2, 253 P.3d 354 (2011). As for his constitutional speedy-trial right, the time from arrest to trial (one year) wasn't especially long, he was being held on other charges too, and the only potential prejudice to Sola-Morales was the loss of Duarte's testimony, which seemed relatively unimportant. So even if the speedy-trial motion had been presented to the district court, Sola-Morales has not shown that the district court should have found a speedy-trial violation and dismissed the charges against him. That means the case would still have proceeded to trial, and Falk's conflict didn't affect his representation at trial. So Sola-Morales can't satisfy the *Strickland* requirements.

But if *Cuyler* applies, Sola-Morales has met the requirement to show that the conflict affected the adequacy of Falk's representation. See *State v. Moyer*, 309 Kan. 268, Syl. ¶ 5, 434 P.3d 829 (2019); *Cheatham*, 296 Kan. at 448; *Galaviz*, 296 Kan. at 183-84.

No one disputes that Sola-Morales was brought to the courthouse on the day of the hearing on his motion but never entered the courtroom. Sola-Morales had a right to be heard and to be present for that hearing. See K.S.A. 2005 Supp. 22-3405(1); *State v. Calderon*, 270 Kan. 241, 245, 13 P.3d 871(2000). And no one disputes that Falk withdrew the motion that day—Falk said so in his testimony but claimed that Sola-Morales gave him permission. Sola-Morales denied ever giving Falk permission to withdraw the motion and testified that Falk told him that the court dismissed his motion. Sola-Morales also testified that Falk told him he should not attend the hearing. The trial court necessarily accepted Sola-Morales' testimony on this point over Falk's in its initial oral and written rulings.

By telling Sola-Morales that his motion had been dismissed, Falk implied to Sola-Morales that "the issue of denial of speedy trial rights was irrevocably closed." *Sola-Morales*, 300 Kan. at 896. That decision "suggest[s] a chosen path of self-interest when faced with divided loyalties." 300 Kan. at 896. An attorney without Falk's conflict would have made sure that Sola-Morales got to be present in court to hear any discussion about his self-prepared motion to dismiss and to provide his own comments. Perhaps some argument beyond those we've seen could have been developed had Falk properly presented the speedy-trial issue when Sola-Morales raised it. But Falk chose his personal interest over his client's; Sola-Morales has shown that Falk's conflict of interest adversely affected the representation.

Because of these apparently divergent results under the *Cuyler* and *Strickland* standards, I would decide which standard should be applied when the conflict is with the attorney's personal or financial interests. At least in this case, the attorney faced one primary decision in which the attorney chose between his personal interest and the client's interest. In that circumstance, there's no difficulty in figuring out whether prejudice occurred—we can compare the two courses of action side by side. The *Cuyler* standard is an exception to the normal rule, and *Mickens* suggests it applies only when

47

there's some "difficulty of proving [the] prejudice." *Mickens*, 535 U.S. at 175. I therefore would not apply *Cuyler* here.

I conclude, then, that the *Strickland* standard applies in this case. Sola-Morales has not shown a probability that the outcome of the case would have been any different absent the attorney's conflict because even if his speedy-trial motion would have been presented, the case would still have proceeded to trial. And there's no showing that the attorney's conflict affected his representation of Sola-Morales at trial. On this basis, I agree that Sola-Morales is not entitled to a new trial.